**Carole Seno SONG, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 98–646C.**

United States Court of Federal Claims.

May 10, 1999.

---

Lisa Chiyemi Ikemoto, Pasadena, California, attorney of record for plaintiff.

Steven J. Abelson, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom was David M. Cohen, Director, attorneys of record for the defendant. Tink D. Cooper, Office of Redress Administration, Department of Justice, Washington, D.C., of counsel.

## OPINION

HORN, Judge.

This case comes before the court on the plaintiff's motion for summary judgment and the defendant's cross-motion for summary judgment, both based upon a review of the administrative record. Carole Seno Song first submitted her petition for redress under the Civil Liberties Act of 1988, 50 U.S.C. app. §§ 1989–1989b–9. (1988 & Supp. V 1993), in August, 1995. On June 23, 1997, defendant, through the Office of Redress Administration of the United States Department of Justice, Civil Rights Division, denied Ms. Song's claim, relying on their interpretation of the regulations issued by the Department following the decision by the United States Court of Appeals for the Federal Circuit in *Ishida v. United States*, 59 F.3d 1224 (Fed.Cir.1995). Ms. Song appealed the Office of Redress Administration's denial of her claim on August 11, 1997. On March 23, 1998, the Appellate Section of the Department of Justice, Civil Rights Division, affirmed the Office of Redress Administration's denial. A complaint was filed in this court on August 10, 1998, seeking redress for Ms. Song under the Civil Liberties Act of 1988.

## FACTS

Carole Meiko Seno Song is the daughter of Toshiko Margaret Seno and Masami Sam Seno. Until early 1942, Toshiko and Masami Seno lived in Huntington Park, California. On February 19, 1942, after the United States declared war on Japan, President Franklin D. Roosevelt issued Executive Order No. 9066, 7 Fed.Reg. 1407 (1942), to address issues regarding potential espionage and sabotage. The order permitted military commanders to designate military areas from which any persons could be excluded or in which any persons could be detained. *Korematsu v. United States*, 323 U.S. 214, 216–17, 65 S.Ct. 193, 89 L.Ed. 194 (1944). On March 2, 1942, General J.L. DeWitt, Military Commander of the Western Defense Command, issued Public Proclamation No. 1, 7 Fed.Reg. 2320 (1942), which declared the entire Pacific Coast as "particularly subject to attack," and created the first "military areas" which would be regulated by subsequent proclama-

tions. The military orders that followed eventually designated all of California, Washington, Oregon, Idaho, Montana, Nevada, Utah, and the southern portion of Arizona as "military areas," restricted the migration of individuals of Japanese ancestry located within these areas, and imposed criminal penalties for any violations of the restrictions established. *Korematsu v. United States,* 323 U.S. at 225–29, 65 S.Ct. 193 (Roberts, J., dissenting); *see also* Act of March 21, 1942, Pub.L. No. 77–503, 56 Stat. 173 (1942) ("An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones."). Individuals of Japanese ancestry, including plaintiff's family, were ordered to evacuate these military areas and were moved to assembly centers and detained in relocation centers. *Id.* at 221, 65 S.Ct. 193.

Each member of the Seno family is of Japanese descent and a United States citizen by birth. As a result of Executive Order 9066, and the laws and government acts related to it, the Senos and their first child, Wayne, were ordered to leave their home as of April 23, 1942. The Senos initially were sent to the Santa Anita Assembly Center on April 29, 1942. The Seno's second child, Glenn, was born at Santa Anita on June 16, 1942. On October 22, 1942, the Senos and their two children were transferred to the Jerome Relocation Center, located in southeast Arkansas.

In the Spring of 1944, Masami Seno was granted seasonal leave status by the federal government to work at Seabrook Farms Frozen Foods (Seabrook Farms) in Bridgeton, New Jersey. Seabrook Farms employed approximately 1,500–2,500 Japanese–American internees and, according to the plaintiff and not refuted by the defendant, a substantial number of prisoners of war to fulfill contracts with private purveyors and the United States, to provide food for military troops. Shortly after Masami Seno went on work leave, on June 1, 1944, Toshiko, Wayne, Glenn, and, in his absence, Masami Seno were transferred to the Rohwer Relocation Center in Arkansas.

On October 26, 1944, the United States granted Masami Seno "indefinite leave-employment" status to continue working at Seabrook Farms. At the same time, Toshiko, Wayne and Glenn were given leave to join Masami Seno at Seabrook Farms. As a condition of leave, the Senos had to agree to keep the War Relocation Authority informed of any change of address. The Senos resided in housing provided at Seabrook Farms, in Bridgeton, New Jersey.

Mr. Bruce Peterson, Mayor of Upper Deerfield Township, New Jersey, in which Seabrook Farms is located, testified at a 1989 House of Representative's subcommittee hearing about the area of Seabrook Farms and the company's worker housing:

MAYOR PETERSON: Upper Deerfield Township is an approximately 32 square mile municipality located in the northwest corner of Cumberland County, New Jersey. The township is 50 miles west of Atlantic City. It's still largely a rural area where agriculture is a primary industry. Crops include vegetables, grains and nursery stock. Large portions of the community are now residential suburbs.... At present the population is estimated at 7,000 people. The largest employers in the area are two food processing firms located in and around the locality of Seabrook. Seabrook is named for Charles F. Seabrook, founder of Seabrook Farms Frozen Foods and a contemporary of Clarence Birdseye in the establishment of the frozen food business in the '30s and '40s. Seabrook, due to its central location within the township, is the site of its schools, municipal hall, and the former Seabrook village, the reason for my appearance here today. Because Seabrook Farms as a food processor was considered to be essential to the war effort and housing was necessary to provide shelter for its workers, the Federal Public Housing Authority in 1944 leased 40 acres of land from Seabrook and on it constructed 35 buildings containing a total of 200 apartments and 11 dormatory [sic] buildings in which there were 85 apartments and 124 sleeping rooms.... In the spring of 1946, since World War II had ended the previous year, the Federal

Public Housing Authority wished to withdraw from the operation of the project and arrange to turn its holdings over to Seabrook Farms on a lease basis. It is important to note that this housing was designed and built to be temporary housing. All buildings were constructed of cinderblock on concrete block with sheetrock roofs. The residents of the apartments, [were] for the most part of Japanese ancestry, and had been recruited to work at Seabrook from the relocation centers of the West where they had been interned as enemy aliens at the beginning of the war with Japan.

*HUD Section 8 Program: Hearing of the Employment and Housing Subcommittee of the House Government Operations Committee*, 101st Cong. (1989), *published in* Federal News Service, June 20, 1989 (statement of Bruce Peterson, Mayor of Upper Deerfield Township, New Jersey); *see* H.R.Rep. No. 101–977 (1990) (noting statements of Mayor Peterson in report).

On December 17, 1944, United States Army Major General H.C. Pratt, Commanding General of the Western Defense Command Headquarters issued Public Proclamation No. 21, 10 Fed.Reg. 53 (1945), that resulted in "modifications and relaxation of restrictions" of the orders and enforcing laws that excluded persons of Japanese ancestry from the sensitive areas of the Western Defense Command. Paragraph eight of the proclamation, however, stated:

In order that the departure from War Relocation Project Areas may proceed in an orderly and peaceful manner Public Proclamation No. 8, dated 27 June 1942, and Civilian Restrictive Orders Nos. 18, 19, 20, 23, 24, 30 shall remain in force and effect until midnight, 20 January 1945, at which time they shall be of no further force or effect except as to those persons who have been designated individually for exclusion or other control, or may be so designated at a future date.

*Id.* at 53. The proclamation modified "the system of mass exclusion of persons of Japanese ancestry" to "a system of individual determination and exclusions of those individuals whose presence within sensitive areas of the Western Defense Command is deemed a source of potential danger to the military security thereof." *Id.* Proclamation No. 21 was issued on December 17, 1944, the effective date of the proclamation was January 2, 1945, although it only became fully effective on January 20, 1945. *Id.* at 53–54. The recision of the exclusion orders was expressly based on an individualized vetting process which resulted in the development of lists of individuals who would remain subject to exclusion and the development of a "white list" of individuals who would no longer be excluded after the effective dates in the proclamation. *Id.* at 53. The proclamation specifically states that "[a]vailable information permits the determination of potential danger on an individual basis." *Id.*

The text of Proclamation No. 21 included a paragraph that directed "those persons of Japanese ancestry who desire to know if they are on the list of those persons who will be permitted to return to the Exclusion Areas of the Western Defense Command" to "send their inquiries to the Commanding General, Western Defense Command, Presidio of San Francisco, California, attention: Civil Affairs Division."[1] 9 Fed.Reg. at 53. In a statement released the day after Proclamation No. 21 was issued, Secretary of the Interior Harold L. Ickes discussed the efforts of the War Relocation Authority (WRA) in assisting, directing and approving of resettlement plans of Japanese–Americans:

The Western Defense Command's action in revoking the blanket exclusion orders for persons of Japanese ancestry on the Pacific Coast means, in its simplest terms, that the War Relocation Authority will immediately expand its relocation program to cover the entire country including the West Coast. It most definitely does *not* mean that there will be a hasty mass

---

1. The defendant notes that 4,963 individuals were placed upon the individual exclusion lists. Of that number, 510 individuals were unaccounted for, 3066 individuals were located at the Tule Lake Segregation Center, and 1897 individuals were located in other camps. Over 115,000 individuals were placed upon the "white list" of persons who were no longer excluded from returning to their homes on the West Coast.

movement of all evacuees back into the coastal area. The War Relocation Authority will continue and intensify its efforts to relocate in parts of the United States other than the West Coast, those loyal and law-abiding persons of Japanese ancestry who are willing to participate in this program. It will also aid those who prefer to exercise their legal and moral right to return to the West Coast.

The persons who are eligible for relocation or return to the West Coast have been found by the Army authorities to be loyal citizens or law-abiding aliens. They are entitled to their full constitutional and legal rights, and perhaps to something more than ordinary consideration because they have really suffered as a direct result of the war. In a real sense, these people, too, were drafted by their country. They were uprooted from their homes and substantially deprived of an opportunity to lead a normal life. They are casualties of war.

It is the responsibility of every American worthy of citizenship in this great Nation to do everything that he can to make easier the return to normal life of these people who have been cleared by the Army authorities. By our conduct towards them we will be judged by all of the people of the world.

\*     \*     \*     \*     \*     \*

All of the evidence available at the relocation centers indicates that the majority of the evacuee residents have not yet finally decided whether to return to their former homes or relocate elsewhere, and that most of those who eventually elect to go back will need considerable time in making necessary arrangements before they can actually leave the centers. The War Relocation Authority is now formulating detailed plans for keeping the westward relocation movement on a gradual, orderly and systematic basis.

People of Japanese ancestry both at the relocation centers and elsewhere who have been found eligible by the Western Defense Command for residences in the West Coast area are of course free to go back at any time. However, only those whose specific plans for resettlement in the evacuated area are approved by WRA will be eligible for travel assistance which the Authority now extends to those relocating in other parts of the country. This includes the payment of rail or bus fare to the point of relocation and transportation of personal properties such as household furnishings. Since most of the evacuees at the relocation centers have had little opportunity to accumulate savings over the past two and a half years, they will doubtless need such assistance. Only a few evacuees therefore are expected to leave the centers, either for the West Coast or any other destination, without first having their plans checked and approved by WRA.

(emphasis in original). The government did not provide personal notice about the lifting of the exclusion orders to those who had been excluded from the West Coast, instead relying on publication in the Federal Register and newspaper coverage to provide notice. 62 Fed.Reg. 19928, 19930 (April 24, 1997).

Carole Seno Song was born on June 5, 1945, in Bridgeton, New Jersey while her parents were en route from Seabrook Farms to the Bridgeton hospital. At the time of her birth, the War Relocation Authority had knowledge of the Seno family's location and place of work, specifically, that the Seno family lived and worked at Seabrook Farms. The Seno family, moreover, believed that they were under the jurisdiction of the War Relocation Authority and that they could be returned to the Rohwer Relocation Center at any time. Had the Seno family remained at the Rohwer Relocation Center, Carole Seno Song would have been born there.[2] The Rohwer Relocation Center does not appear to have closed until November 30, 1945.[3]

---

**2.** This fact is not disputed by the government, but the defendant does state it is the government's position that there were no legal barriers to preventing the Seno family from returning to their home as of January 20, 1945. The defendant's attorney also stated at oral argument that

if the plaintiff had been born at a camp (even after the January 20, 1945 statutory eligibility cutoff) she would be eligible for redress under the Civil Liberties Act.

**3.** There is no evidence in the administrative record as to the date the Rohwer Relocation Center

As announced by the Secretary of the Interior Harold L. Ickes in his statement about the role and efforts of the War Relocation Authority, issued on December 18, 1944, the federal government was implementing two policies that directly affected Japanese–Americans trying to resettle or relocate. One policy was to permanently relocate Japanese–Americans outside the West Coast area "to bring about a better economic adjustment and a more satisfactory nation-wide distribution of a minority group which was doubtless too heavily concentrated before the war in one particular section of the country." The second policy was to ensure a gradual return of those who desired to return and resettle on the West Coast.

Moreover, on April 2, 1945, Secretary of the Interior Harold L. Ickes, recommended against the enactment of H.R. 1619, a bill "to provide for the prompt closing of relocation centers maintained by the War Relocation Authority." In recommending against enactment of the bill, Secretary Ickes cited the unavailability of adequate transportation facilities or sufficient housing, the assurances made to the War Department and to the people of the West Coast about a "gradual and orderly return" of Japanese–Americans, and the government's policy "of dispersing the evacuees as much as possible throughout the country." [4]

A report issued to Congress by the Commission on Wartime Relocation and Internment of Civilians, based on a study undertaken at the request of Congress pursuant to Pub.L. No. 96–317, 94 Stat. 964, § 2 (1980), contains discussion about the continuing hardships faced by Japanese–Americans directly after the restrictions were lifted, including:

> The end of mass exclusion did not spell the end of hardship for the evacuees. Throughout 1945, evacuees returned to the West Coast, not only from camps but also from the interior states where they had resettled. For many, leaving the camps

was a traumatic as entering them. However unpleasant their lives in camp, it was preferable to an unknown possibly hostile reception on the West Coast.... Suicides, especially among elderly bachelors were reported. Many were frightened, particularly of reintegrating with whites after the segregated life of the camps. Some came to resettlement lacking self-esteem, and perhaps identifying with the stereotypes that had been projected upon them. Some felt the burden of starting over, at an older age and for a second time. After encouraging everyone to leave and scheduling closing dates for each camp, the WRA finally gave the remaining evacuees train fare to the point of their evacuation, and made them leave.

... Each person was given an allowance of $25. Very few could come back to their prewar holdings. Only about 25 percent of the prewar farm operators, for example, retained property.

Many testified that their stored possessions had been lost or stolen. Sometimes taxes had not been paid, and special measures to keep property from tax sales were required. Others found their homes or farms ill-cared-for, overgrown with weeds, badly tended or destroyed. Furnishings, farm equipment and machinery were lost or stolen. One person reported finding strangers living in his former home.

Almost uniformly, those who did not return to homes they owned testified that housing was extremely hard to find because of postwar shortages and discrimination against Japanese Americans. The WRA concluded that "no other problem has provided so widespread an obstacle to satisfactory adjustment." ...

Housing was not the only problem—during the first six months of 1945, violence was relatively common. One of the first incidents occurred on January 8, when someone tried to dynamite and burn an evacuee's fruit packing shed. About

---

closed down, however, the defendant does not dispute this date as presented by the plaintiff.

**4.** Government plans to assist Japanese–Americans to return to the West Coast appear to have focused primarily, if not exclusively, on persons

interned at relocation centers and did not expressly take into account the needs of those on work leave at jobs away from the camps, but still assigned to the camps.

thirty incidents followed, mostly shots fired into evacuee homes. Boycotts of evacuee produce were threatened. General harassment, such as signs announcing "No Japs allowed, no Japs welcome," was widespread.

Although jobs on the West Coast were relatively plentiful, much employment discrimination blocked evacuees, and many had to take menial jobs. . . .

*Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians* 240–42 (1982) (footnotes omitted).

## DISCUSSION

The plaintiff in the above-captioned case filed a motion for summary judgment and the defendant filed a cross-motion for summary judgment, both based upon a review of the administrative record pursuant to RCFC 56.1.[5] Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 and 56.1 are patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect.[6] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56 provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is

entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.,* 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States,* 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Cloutier v. United States,* 19 Cl.Ct. 326, 328 (1990), *aff'd,* 937 F.2d 622, 1991 WL 93077 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find

---

5. Under RCFC 56.1, the same standards apply for judgment on the administrative record as for summary judgment under RCFC 56. *See, e.g., United Int'l Investigative Servs., Inc. v. United States,* 41 Fed.Cl. 312, 317 (1998); *Delbert Wheeler Constr., Inc., v. United States,* 39 Fed.Cl. 239, 246 (1997); *Mike Hooks, Inc. v. United States,* 39 Fed.Cl. 147, 153 (1997); *Analytical & Research Technology, Inc. v. United States,* 39 Fed.Cl. 34, 42 (1997); *Neptune v. United States,* 38 Fed.Cl. 510, 513 (1997); *Strickland v. United States,* 36 Fed.Cl. 651, 654 (1996); *Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255, 1997 WL 177509 (Fed.Cir.1997); *Clifton v. Unit-*

ed States, 31 Fed.Cl. 593, 596 (1994), *aff'd,* 66 F.3d 345, 1995 WL 540183 (Fed.Cir.1995).

6. In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 56 and 56.1. *See Jay v. Sec'y DHHS,* 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the nonmoving party cannot present evidence to support its case under any scenario, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679.

The fact that both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Casualty & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States*, 29 Fed.Cl. 318, 322 (1993), *aff'd*, 31 F.3d 1176, 1994 WL 329612 (Fed. Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States*, 812 F.2d at 1391.

In the above-captioned case, the parties have filed an extensive administrative record, have stated that there are no genuine issues as to any material facts, and have indicated that summary judgment is appropriate. Moreover, no issues have been identified by either party or by the court which raise material issues of disputed fact. Thus, the court determines that this case is ripe for summary disposition.

Congress adopted the Civil Liberties Act of 1988, 50 U.S.C. app. § § 1989–1989b–9 (1988 & Supp. V 1993) in 1988 to address the internment by the United States during World War II of individuals of Japanese ancestry. Earlier, in 1980, Congress had established the Commission on Wartime Relocation and Internment of Civilians (the Commission) to study the grievances of United States citizens of Japanese ancestry who had been interned during World War II. Pub.L. No. 96–317, 94 Stat. 964, § 2 (1980). The Commission issued its report in 1982, entitled *Personal Justice Denied: Re-*

*port of the Commission on Wartime Reloca-
tion and Internment of Civilians* (1982), and
its formal recommendations in 1983, entitled
*Personal Justice Denied: Part 2: Recom-
mendations; Report of the Commission on
Wartime Relocation and Internment of Ci-
vilians* (1983). In response, Congress
adopted the Civil Liberties Act of 1988.

In describing the purposes behind the Civil
Liberties Act in sections 1989 and 1989a,
Congress attempts to acknowledge, apologize
and provide restitution for the United States'
internment policy during World War II. In
section 1989(1) and (2), Congress expressly
acknowledges "the fundamental injustice of
the evacuation, relocation, and internment of
United States citizens and permanent resi-
dent aliens of Japanese ancestry during
World War II," and offers a formal apology
to all those who were subject to this injustice
"on behalf of the people of the United
States." 50 U.S.C. app. § 1989(1)–(2), (4).
Congress also stated that the purpose of the
act was to "discourage the occurrence of
similar injustices and violations of civil liber-
ties in the future; and ... [to] make more
credible and sincere any declaration of con-
cern by the United States over violations of
human rights committed by other nations."
50 U.S.C. app. § 1989(6)–(7).

In addition to acknowledging that a "grave
injustice was done to both citizens and per-
manent resident aliens of Japanese ancestry
by the evacuation, relocation, and internment
of civilians during World War II" and issuing
an apology to all citizens and permanent
resident aliens of Japanese ancestry who had
been interned, Congress also established a
program to provide token financial restitu-
tion to some of these individuals. 50 U.S.C.
app. § 1989a. To qualify as an "eligible indi-
vidual" entitled to restitution pursuant to the
statute as amended, section 1989b–7 pro-
vides:

> (1) the term "evacuation, relocation, and
> internment period" means that period be-
> ginning on December 7, 1941, and ending
> on June 30, 1946;

> (2) the term "eligible individual" means
> any individual of Japanese ancestry, or the
> spouse or a parent of an individual of
> Japanese ancestry, who is living on the

date of the enactment of this Act [Aug. 10,
1988] and who, during the evacuation, relo-
cation, and internment period—

> (A) was a United States citizen or a
> permanent resident alien; and

> (B)(i) was confined, held in custody, re-
> located, or otherwise deprived of liberty
> or property as a result of—

> (I) Executive Order Numbered 9066,
> dated February 19, 1942;

> (II) the Act entitled "An Act to pro-
> vide a penalty for violation of restric-
> tions or orders with respect to persons
> entering, remaining in, leaving, or
> committing any act in military areas
> or zones", approved March 21, 1942
> (56 Stat. 173); or

> (III) any other Executive order, Pres-
> idential proclamation, law of the Unit-
> ed States, directive of the Armed
> Forces of the United States, or other
> action taken by or on behalf of the
> United States or its agents, represen-
> tatives, officers, or employees, re-
> specting the evacuation, relocation, or
> internment of individuals solely on the
> basis of Japanese ancestry; or

> (ii) was enrolled on the records of the
> United States Government during the peri-
> od beginning on December 7, 1941, and
> ending on June 30, 1946, as being in a
> prohibited military zone;

except that the term "eligible individual"
does not include any individual who, during
the period beginning on December 7, 1941,
and ending on September 2, 1945, relocat-
ed to a country while the United States
was at war with that country; ...

50 U.S.C. app. § 1989b–7.

Under section 1989b–4 of the Act, the At-
torney General is responsible for identifying,
locating, and paying the sum of $20,000.00 as
compensation to each "eligible individual."
50 U.S.C. app. §§ 1989b–4(a) & (b). Con-
gress specifically mandated that potentially
eligible individuals be notified:

**(2) Location of eligible individuals**

The Attorney General shall identify and
locate, without requiring any application
for payment and using records already in
the possession of the United States Gov-

ernment, each eligible individual. The Attorney General should use funds and resources available to the Attorney General, including those described in subsection (c), to attempt to complete such identification and location within 12 months after the date of the enactment of this Act [Aug. 10, 1988]. Any eligible individual may notify the Attorney General that such individual is an eligible individual, and may provide documentation therefor. The Attorney General shall designate an officer or employee to whom such notification and documentation may be sent, shall maintain a list of all individuals who submit such notification and documentation, and shall, subject to the availability of funds appropriated for such purpose, encourage, through a public awareness campaign, each eligible individual to submit his or her current address to such officer or employee. To the extent that resources referred to in the second sentence of this paragraph are not sufficient to complete the identification and location of all eligible individuals, there are authorized to be appropriated such sums as may be necessary for such purpose. In any case, the identification and location of all eligible individuals shall be completed within 12 months after the appropriation of funds under the preceding sentence. Failure to be identified and located by the end of the 12-month period specified in the preceding sentence shall not preclude an eligible individual from receiving payment under this section.

50 U.S.C. app. § 1989b–4(a)(2).[7]

Subsequent to the enactment of the statute, the Attorney General promulgated regulations in order to implement the mandate of the Civil Liberties Act. *See* 28 C.F.R. §§ 74.1–74.17 (1997). Through the Office of Redress Administration, Civil Rights Division, Department of Justice (ORA), the Attorney General, as quoted above, notifies individuals of their potential eligibility and verifies their claims upon receipt of certain

background information. In the event that the ORA determines that an individual is ineligible, that person may seek reconsideration from the Assistant Attorney General for Civil Rights and, thereafter, in the United States Court of Federal Claims. *See* 50 U.S.C. app. § 1989b–4(h).

Congress also included in the Civil Liberties Act a presumption regarding the weight of the evidence presented by a claimant:

### (3) Benefit of the doubt

When, after consideration of all evidence and relevant material for determining whether an individual is an eligible individual, there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of eligibility, the benefit of the doubt in resolving each such issue shall be given to such individual.

50 U.S.C. app. § 1989b–4(a)(3). *See Motoyoshi v. United States,* 33 Fed.Cl. 45, 53 (1995) ("a construction that gives meaning to the words 'otherwise deprived of liberty' would implement the direction in the 1992 Amendments to give the benefit of the doubt to an individual requesting restitution."); *see also Kaneko v. United States,* 122 F.3d 1048, 1051 (Fed.Cir.1997) (holding that despite the "benefit of the doubt" standard, the lower court properly found that "evidence overwhelmingly, although not entirely, support[ed] the ORA's decision.").

In *Ishida v. United States,* 59 F.3d 1224 (Fed.Cir.1995), the United States Court of Appeals for the Federal Circuit addressed the issue of the eligibility of "children born to parents of Japanese ancestry who were excluded from their family homes in prohibited military zones during the statutory period (the period beginning on December 7, 1941, and ending on June 30, 1946)" to receive monetary compensation, as provided in 50 U.S.C. app. § 1989b–4(a)(1), as follows:

We hold that Congress clearly intended to include as eligible anyone, including la-

---

**7.** It is ironic that for the purposes of defining those individuals eligible for the restitution program, extensive personal notification procedures were mandated, yet for the restoration of liberties pursuant to Proclamation No. 21, the government argues in the case before the court that it was entitled to rely on word of mouth, general publication in newspapers, and publication in the Federal Register without any individual notification necessary or personal notification procedures implemented.

ter born children, of Japanese ancestry who has been "deprived of liberty" as a result of the laws and orders which caused them to be excluded from their family's place of residence in a prohibited military zone.

\* \* \* \* \* \*

Section 1989b–7(2)(B)(i) states that an eligible individual is one deprived of liberty or property, during the statutory period, "as a result of," inter alia, Executive Order 9066 or 56 Stat. 173, the "Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military zones or areas." Consequently, we hold the Act entitles to compensation all children who were deprived of liberty because they were excluded from their family homes as a result of Executive Order 9066 and who could not return to their homes without committing a crime under the criminal statute. These individuals suffered a grave deprivation of liberty as a direct result of government action excluding them (and their parents)· from their family homes. They suffered economic hardship, ostracism, and familial disruption, along with their parents, as a result of government action.

1. An interpretation of the Act that excludes those individuals who were not "confined, held in custody, [or] relocated," or otherwise not explicitly provided for in the statute would render superfluous the phrase "or otherwise deprived of liberty." The rules of statutory construction require a reading that avoids rendering superfluous any provision of a statute. *See Ratzlaf v. United States,* 510 U.S. 135, [140–41], 114 S.Ct. 655, 659, 126 L.Ed.2d 615 (1994). By including the phrase "or otherwise deprived of liberty" as an independent basis for eligibility, Congress necessarily intended that those individuals of Japanese ancestry who were "deprived of liberty" as a result of the enumerated government actions will be compensated even though they were not "confined, held in custody, [or] relocated." Thus, the Assistant Attorney General's reconsideration decision declaring Ishida ineligible because he was not

"confined, held in custody, [or] relocated," without more, would render superfluous and devoid of meaning the alternative basis for recovery, i.e., being "otherwise deprived of liberty."

Indeed, the DOJ's regulations recognize other classes of eligible individuals, such as members of the Armed Forces of the United States at the time of the evacuation, relocation, and internment period who were prohibited from visiting their families or were forced to submit to restrictions resulting in a loss of liberty, i.e., who were "otherwise deprived of liberty or property." To this end, the Act provides compensation for those who suffered deprivations of liberty, such as exclusion from their domicile, as a result of the government actions specified in the Act. *See* 50 U.S.C.App. § § 1989b–7(2)(B)(i)(I) & (II) (1988).

*Ishida v. United States,* 59 F.3d at 1229–30 (alterations in original) (footnotes omitted); *see also Motoyoshi v. United States,* 33 Fed. Cl. at 53 ("It is obvious that a person of Japanese ancestry, such as plaintiff, who was born after his parents relocated, was deprived of liberty under the Act. The only interpretation of the category 'otherwise deprived of liberty' that is reasonable is that it was meant to be broadly applied.").

The United States Court of Appeals for the Federal Circuit stated that "[t]he DOJ's policy denying compensation to individuals like Ishida who were deprived of basic civil liberties as a result of government action is even more unreasonable when one considers that the Act compensates mere property loss" even in circumstances when there was not a deprivation of liberty, *Ishida v. United States,* 59 F.3d at 1230 n. 3 (citing 50 U.S.C. app. § 1989b–7(2)(B)(i)), because the statute specifically provides compensation for those "otherwise deprived of liberty *or property,*" 50 U.S.C. app. § 1989b–7(2)(B)(i) (emphasis added).

The United States Court of Appeals for the Federal Circuit also addressed the definition of "deprivation of liberty" under the Act:

neither the Act, the regulations, nor the legislative history includes "directly affected" in the test for eligibility. We conclude

that the Commission and Congress clearly intended that all individuals deprived of liberty by being excluded from their homes as a result of the enumerated government actions be eligible. That such individuals were not also subject to other direct government actions such as internment is irrelevant because liberty deprivation, as we note above, is an alternative or additional ground for compensation.

\* \* \* \* \* \*

Nothing in the Act or its legislative history states or even suggests that eligibility is limited to individuals who can show more than one type of deprivation of liberty as a result of the enumerated government actions. Indeed, requiring more than one liberty deprivation is inconsistent with the operative language of the Act which merely requires that an individual who was not confined meets the alternative standard of having been "otherwise deprived of liberty." In this case, the exclusion from one's original place of residence, or home, is the relevant deprivation of liberty.

*Id.* at 1232. Furthermore, in *Ishida v. United States,* the United States Court of Appeals for the Federal Circuit discussed the significance of the "family home" and the impact upon an infant born elsewhere because of the government's action:

Therefore, although we refrain from reading the full legal import of the term "domicile" into the Act, we use the term "home" or "family home" or original place of residence (place of residence) in the sense of the legal concept of "domicile" because we conclude that the Commission and Congress intended to cover those excluded from their "home" or "original place of residence" in a prohibited military zone. Contrary to the arguments posed by the government, considering the Commission's express intent to compensate individuals "excluded from their places of residence" the phrase "otherwise deprived of liberty" cannot reasonably be construed to deny compensation to individuals such as Ishida who were indeed excluded from their homes in the prohibited military zones directly as a result of the government's actions. To conclude that an infant's "home" is other than his parents' home would depart from congressional intent, conflict with state family law on determining a child's domicile, and effect an absurd result.

*Id.* at 1233.

The ORA responded to the decision issued by the United States Court of Appeals for the Federal Circuit in *Ishida v. United States* with an amendment to its regulations:

The Department of Justice ("Department") hereby adopts a change to the regulations governing redress provisions for persons of Japanese ancestry. This change will amend the standards of the Civil Liberties Act of 1988, which authorizes the Attorney General to identify, locate, and make payments of $20,000 to eligible persons of Japanese ancestry. This change will amend the Act's standards to make eligible those persons who were born outside the prohibited military zones on the West Coast after their parents "voluntarily" evacuated as a result of military proclamations issued pursuant to Executive Order 9066. This change will also make eligible for redress those persons who were born outside the prohibited military zones in the United States after their parents were released from internment camps and whose parents had resided in areas that became part of the prohibited military zones on the West Coast immediately prior to their internment. In practice, this amendment will make potentially eligible those persons who were born after their parents were evacuated, relocated, or interned by the United States Government, and who were legally excluded from their parents' original place of residence in the prohibited military zones on the West Coast.

62 Fed.Reg. 19928; *see also* 28 C.F.R. § § 74.3, 74.4 (1997). In the preamble to the change in the regulations the ORA addressed the issue of notice to dislocated individuals of the opportunity to return to their domiciles in California, specifically, "that persons were unable to return immediately to the West Coast because of the lack of notice that the exclusion zones were lifted on January 3, 1945." The preamble includes the following discussion:

First, a number of comments mentioned that there was a lack of notice regarding the December 17, 19[4]4 announcement of the lifting of the exclusion restrictions on the West Coast by Proclamation No. 21 and asserted that, as a result, many families were unaware that they could return to the exclusion zones. (We note that the phrases "exclusion zones," the "prohibited zone," and the "prohibited military zones" are used interchangeably.) Several comments suggested that dates other than the date proposed by the Department should serve as the standard for notice of the lifting of the exclusion zones on the West Coast, including (1) the spring of 1945; (2) the summer of 1945; (3) the end of World War II; (4) the end of 1945; (5) early 1946; (6) June 30, 1946; and (7) December 1946.

After conducting additional research, the Department concludes that widespread public notice of the lifting of the exclusion restrictions was disseminated in December 1944 and January 1945. Substantial evidence exists of contemporaneous public notice beginning on December 17, 1944. News of the release of Public Proclamation No. 21, announcing the lifting of the West Coast exclusion zones, was distributed nationally by the Associated Press wire on December 17, 1944. In addition, historical research indicates that between December 17, 1944, and December 19, 1944, the lifting of the exclusion zones was prominently reported in all the major newspapers examined: the Arkansas Gazette, Arizona Republic, Chicago Tribune, Cleveland Plain Dealer, Columbus Dispatch, Denver Post, New York Times, Pacific Citizen, Salt Lake City Tribune, San Francisco Chronicle, and Spokesman's Review. These particular newspapers were reviewed because of their nationwide distribution or because of their publication in specific cities or geographic areas where there was a large population of persons of Japanese ancestry.

One comment noted that the lifting of the general exclusion order was not reported in the Cleveland Plain Dealer in January 1945 and confirmed this fact with the paper. We, however, located a lengthy article in the Cleveland Plain Dealer, dated December 18, 1944, which stated:

> The War Department today revoked its order excluding all persons of Japanese ancestry from the west coast . . . . Those persons of Japanese ancestry whose records have stood the test of army scrutiny during the past two years will be permitted the same freedom of movement throughout the United States as other loyal citizens and law abiding aliens.

"Army Drops West Coast Ban on Japs," Cleveland Plain Dealer, Dec. 18, 1944, at A1.

There is other historical evidence of public notification of the lifting of the public proclamations on the West Coast before the war ended. The United States Government allowed three Japanese–American newspapers to continue to publish throughout the war. These newspapers reported news in both English and Japanese and "had wide circulation in the relocation centers." U.S. Dept. of the Interior, People in Motion: "The Postwar Adjustment of the Evacuated Japanese Americans," 203 (1947). One of these papers was the Pacific Citizen, published by the Japanese American Citizens League, which was located in Salt Lake City, Utah. *Id.* This newspaper, along with two others that were published in Denver, provided a further, widely circulated source of timely notice. For example, the Pacific Citizen reported rescission of the prohibited zones as the lead story in its December 23, 1944 issue:

> The War Department on December 17 revoked the military orders excluding persons of Japanese ancestry from the Pacific coast military area. The sweeping revocation of the exclusion orders against citizens and law abiding aliens of Japanese ancestry was carried out through the issuance of Public Proclamation No. 21 . . . .

"Proclamation Restores Right of Evacuee Group to Return to Homes After January 2," Pacific Citizen, Dec. 23, 1944, at 1. In fact, one comment noted that the family subscribed to the Pacific Citizen and stated

that they knew they could return to the West Coast after January 2, 1945. Letter from National Coalition for Redress/Reparations, Janice Yen, to ORA (June 17, 1996, enclosing 13 individual letters) (on file with ORA).

Other evidence of the adequacy of public notice is shown by the sheer numbers of Japanese–Americans who return to the West Coast in 1945. Some 47,235 Japanese–Americans returned to the former prohibited zones in California, Washington, and Oregon, between January 1 and December 31, 1945. This does not include persons who returned to the former prohibited zone in southern Arizona. U.S. Dept. of Interior, WRA Semi–Annual Report, July 1 to Dec. 31, 1945, Statistical App. Table I. Another WRA report indicated that by June 1946, over 57,000 persons of Japanese ancestry returned to the West Coast. U.S. Dept. of Interior, WRA Semi–Annual Report, January 1 to June 30, 1946, at 11.

62 Fed.Reg. at 19930–31.

In the preamble to the change in regulations following the decision in *Ishida v. United States,* the ORA also examined the issue of a claimant's date of birth as a regulatory threshold requirement for eligibility:

A third issue raised by a majority of the comments was the request for an extension of the threshold date for eligibility, proposed as January 3, 1945, to a later date. There were several suggestions for different dates of eligibility to serve as the standard for notice of the lifting of the prohibited military zones on the West Coast. In determining the date that will serve as the standard, however, we must apply the legal standard set forth by the court in *Ishida.* The *Ishida* court established the standard for redress eligibility for persons who were never interned or evacuated based on the deprivation of liberty inflicted on children who were at birth "excluded by law" from "their parents' original place of residence." *Ishida,* 59 F.3d at 1226. The court stated:

[W]e hold the Act entitles to compensation all children who were deprived of liberty because they were excluded from their family homes as a result of Executive Order 9066 and who could not return to their homes without committing a crime under the criminal statute.

*Id.* at 1230. The court also stated that "Congress intended to cover those excluded from their 'home' or 'original place of residence' in a prohibited military zone * * * directly as a result of the government's actions". *Id.* at 1233. The court's focus was on E.O. 9066 and the related military orders issued pursuant to its authority. Thus, once the United States Government action was canceled (i.e., the military proclamations were rescinded) there was no legal bar to the return of such persons to the West Coast. Proclamation No. 21, issued on December 17, 1944, and effective January 2, 1945, rescinded the general legal exclusion enforced under E.O. 9066 excluding individuals of Japanese ancestry from the West Coast. Under Proclamation No. 21, this legal bar was canceled, except for the six small zones maintained by the Army until January 20, 1945.

\*  \*  \*  \*  \*  \*

Although the Department is sympathetic to persons who were in this situation, it must be recognized that after January 20, 1945, the law ceased to act to deprive affected individuals of their liberty to travel and reside as they saw fit. Without a doubt, there were a number of families who, for various reasons, were unable to return for some time to the former exclusion zones. However, the fact remains that after January 20, 1945, individuals were generally free under the law to decide for themselves whether and when they should return to the West Coast. This is the basis for eligibility under *Ishida,* and the Department is bound by the court's strictures.

\*  \*  \*  \*  \*  \*

As a result of the hardships noted above, the majority of comments suggested a threshold eligibility date of June 30, 1946, the termination of the internment period as defined by the Act. Again, even though on that date there continued to be hard-

ships faced by returning evacuees, it is clear that there was no longer a legal impediment imposed by the United States Government in their relocation to the West Coast. The court's focus in *Ishida* was on E.O. 9066 and the related military orders issued pursuant to its authority, which excluded persons of Japanese ancestry. Once the United States Government action was canceled (i.e., the military proclamations were rescinded) there existed no legal bar to their return to any portion of the West Coast.

&ast; &ast; &ast; &ast; &ast; &ast;

As for persons born at liberty but outside of their parents' original places of residence, the court in Ishida indicated a standard of eligibility based upon deprivation of liberty "when they were excluded by law" from their parents' original home in the prohibited zones. *Ishida,* 59 F.3d at 1226. The parents' home must have been in the prohibited military zones and the children must have been excluded based on United States Government action in order to fall within the *Ishida* holding. Thus, once the military proclamations were rescinded, the prohibited zones were no longer in existence on the West Coast.

Finally, we note that another suggested date was December 1946. This date falls outside of the statutorily defined "internment period", however, and cannot be changed by regulation. Only congressional action could amend the law to extend the defined period of the Act. . . .

After thorough consideration regarding the issues concerning the threshold date and the suggested alternative dates, the Department has adopted the standard proposed in a few comments which referred to the fact that small portions of the exclusion zones were maintained by the Army in certain areas of the West Coast until January 20, 1945, while other United States Government action ceased on that date. Proclamation No. 21, although effective at midnight on January 2, 1945, still provided that six Civilian Exclusion Orders (Nos. 18, 19, 20, 23, 24, and 30) would remain in effect until midnight, January 20, 1945. This proclamation also stated that the ef-

fect of this rescission was to restore to all persons of Japanese ancestry who were excluded under the military proclamations of the West Coast, and who were not subject to the individual exclusion orders, their "full rights to enter and remain in the military areas of the Western Defense Command." *Id.* at 2, 10. The Department agrees that, until midnight on January 20, 1945, there was a legal bar to persons returning to these six small areas on the West Coast maintained by the Army. Recognizing that it would be difficult to ascertain specific relocation addresses in these six zones, the Department finds that the threshold date should be January 21, 1945, the date when persons of Japanese ancestry were no longer legally excluded from any portion of the prohibited zones on the West Coast. The Department finds that this date complies with the court's decision in *Ishida.* Once the proclamations were canceled and the prohibited zones were revoked, there was no legal bar for Mr. Ishida's parents to return to their original home. Similarly, for those persons born on or after the date of January 21, 1945, there was no legal bar against their parents returning to their original homes in the former prohibited zones.

Finally, it is important to recognize that once Proclamation No. 21 was rescinded in December 1944, large numbers of persons of Japanese ancestry began returning to the West Coast. Persons began returning after December 17, 1944, and over the next year, over 47,000 Japanese Americans returned to the West Coast. U.S. Dept. of the Interior, WRA Semi–Annual Report, July 1 to Dec. 31, 1945, at Statistical App. Table I.

62 Fed.Reg. at 19930–33.

The ORA regulations were implemented at 28 C.F.R. § 74.3(b)(9) and issued together with the preamble language, quoted above, in the Federal Register. 62 Fed.Reg. 19928. Eligibility for reparations under the ORA's interpretation of the Civil Liberties Act was limited in the regulations to those

Individuals born on or before January 20, 1945, to a parent or parents who had been evacuated, relocated, or interned from his

or her original place of residence in the prohibited military zones on the West Coast, on or after March 2, 1942, pursuant to paragraph (a)(4) of this section, and who were excluded by Executive Order 9066 or military proclamations issued under its authority, from their parent's or parents' original place of residence in the prohibited military zones on the West Coast. This also includes those individuals who were born to a parent or parents who had "voluntarily" evacuated from his or her original place of residence in the prohibited military zones on the West Coast, on or after March 2, 1942, pursuant to paragraph (b)(3) of this section, and who were excluded by Executive Order 9066 or military proclamations issued under its authority, from their parent's or parents' original place of residence in the prohibited military zones on the West Coast.

28 C.F.R. § 74.3(b)(9).

The question before the court in the above-captioned case is whether or not Carole Seno Song, who was born on June 5, 1945, while Ms. Seno's parents and siblings were residing at Seabrook Farms, having been granted "indefinite-work leave" from Rohwer Relocation Center, is eligible for redress under the Civil Liberties Act of 1988.

Plaintiff's pleadings raise a number of arguments that address the fact that the plaintiff was born after the effective date of Proclamation No. 21. According to the plaintiff's brief, however, "[w]hile most of the orders excluding Japanese Americans from the West Coast were officially lifted as of midnight January 20, 19[45], practical barriers maintained by the federal government's acts and omissions prevented many, including Carole Song and her family, from returning to their domicile." The plaintiff argues that a deprivation of liberty (that would allow the plaintiff to qualify for redress) continued after the date implemented by the ORA in the revised regulations discussed above because (1) the lack of notice to those on work leave effectively maintained the Seno family's status under the exclusion orders and (2) the federal government's resettlement policies and practices, including the War Relocation Authority's planned distribution and gradual return policies, maintained barriers and prevented the return of the plaintiff and her family to California, prior to June 5, 1945. The plaintiff notes that these additional laws, acts and policies of the government were not addressed in the regulations or its preamble, and the failure to consider the entirety of government conduct in the period after January 20, 1945, is inconsistent with the December 7, 1941 to June 30, 1946 statutory period for eligibility defined by Congress in 50 U.S.C. app. § 1989b–7(1).

Plaintiff cites *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315, 70 S.Ct. 652, 94 L.Ed. 865 (1950) to argue that newspaper publication is not sufficient notice especially in the context of the due process that should be required to undo a deprivation of liberty. According to the plaintiff, the requirements of due process are underscored when persons are not missing and their location is known, thus making effective notice feasible or possible. In addition, the fact that the defendant knew exactly where the plaintiff's family was residing because the Senos and others similarly situated were mandated to notify the War Relocation Authority of their location indicates that the federal government had the capacity to provide individual notice.

Defendant argues that the eligibility cutoff date of January 20, 1945, as selected by the ORA in the regulations it issued, on April 24, 1997 at 62 Fed.Reg. 19928, is an interpretation of the statute and relevant caselaw. Defendant argues that these regulations should be subject to review under the standards for agency construction of a statute articulated in *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) and, subsequently, adopted by the United States Court of Appeals for the Federal Circuit in *Chacon v. United States*, 48 F.3d 508, 511–12 (Fed.Cir. 1995).

The legal framework to which the defendant points in *Chevron, U.S.A. v. Natural Resources Defense Council* states in relevant part:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 842–43, 104 S.Ct. 2778 (footnotes omitted). The defendant also notes footnote eleven of the Supreme Court's opinion in *Chevron, U.S.A. v. Natural Resources Defense Council:* "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." 467 U.S. at 842–43 n. 11, 104 S.Ct. 2778.

Furthermore, the Supreme Court stated:

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.... " ... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *United States v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961). *Accord Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699–700, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984).

*Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. at 843–45, 104 S.Ct. 2778 (alterations in original) (footnotes omitted).

The defendant argues that when promulgating the revised regulations, ORA followed the intent of the Civil Liberties Act, as interpreted by the United States Court of Appeals for the Federal Circuit in *Ishida v. United States.* *See* 62 Fed.Reg. 19928–31. The defendant cites the preamble to the amended regulations to suggest that the ORA examined the precise issue of notification raised by the plaintiff in the instant action before selecting its regulatory cutoff date of January 20, 1945 for reparations. Finally, the defendant suggests that there is no evidence of restraint on Carol Seno Song that would imply the plaintiff was deprived of liberty at the relevant time, as there was adequate notification of Proclamation No. 21, whether or not the Seno family actually received the information.

■ As indicated above, when this court engages in record review of agency decisions, it is not appropriate to substitute its judgment for that of the agency and the agency construction need not be the only reasonable one that the reviewing court could have reached. *See Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. at 844–45, 104 S.Ct. 2778; *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 167–68, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). The

court recognizes that an executive branch agency's decision is entitled to substantial deference, however, "an agency's interpretation of a statute deserves deference only 'if the statute is silent or ambiguous with respect to the specific issue....'" *Skinner v. Brown*, 27 F.3d 1571, 1575 (Fed.Cir.1994) (quoting *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. at 843, 104 S.Ct. 2778). Moreover, although an agency's decision is entitled to substantial deference, a court "should not defer to an agency position which is contrary to an intent of Congress expressed in unambiguous terms." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992). Stated otherwise, "Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body." *FCC v. RCA Communications*, 346 U.S. 86, 90, 73 S.Ct. 998, 97 L.Ed. 1470 (1953). In reviewing ORA's construction of the Civil Liberties Act, the court must first look to whether Congress has spoken directly to the precise questions at issue. If the language of the Civil Liberties Act is unambiguous and "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Skinner v. Brown*, 27 F.3d at 1572–73, 1575–76. The United States Supreme Court stated in a footnote in the *Chevron* opinion:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

467 U.S. at 842–43 n. 9, 104 S.Ct. 2778 (citations omitted).

In the Civil Liberties Act, Congress assigned judicial review of an appeal from an ORA decision to the United States Court of Federal Claims, and established the appropriate standard of review:

**(1) Review by the Court of Federal Claims**

A claimant may seek judicial review of a denial of compensation under this section solely in the United States Court of Federal Claims, which shall review the denial upon the administrative record and shall hold unlawful and set aside the denial if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

50 U.S.C. app. § 1989b–4(h). Questions of statutory and regulatory construction are reviewed de novo, although ORA's interpretation of the statute it is entrusted with administering is entitled to deference, if reasonable and not contrary to the legislative intent. *See Kaneko v. United States*, 122 F.3d 1048, 1051 (Fed.Cir.1997).

The interplay between the deferential standard of review of agency decisions discussed immediately above, pursuant to 50 U.S.C. app. § 1989b–4(h)(1), and the statutory requirement of giving the evidentiary benefit of the doubt to a claimant, pursuant to 50 U.S.C. app. § 1989b–4(a)(3), was addressed by the United States Court of Appeals for the Federal Circuit in *Kaneko v. United States*:

> "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985), all the less could it be arbitrary and capricious. The test is whether the views of truth between which the fact finder selected were both plausible.

122 F.3d at 1054.[8]

In the case before this court, we begin by assessing whether the plaintiff meets the re-

---

8. The court in *Kaneko v. United States* also noted that the facts presented were so skewed in the government's favor that the "benefit of the doubt" standard was rebutted:

> While we agree with Mrs. Kaneko that the "benefit of the doubt" standard must be applied in appropriate cases, we cannot agree that this is such a case. As discussed below, this is not a case where "there is an approxi-

quirement in the Civil Liberties Act that to be eligible for compensation, individuals must have been "confined, held in custody, relocated, or otherwise deprived of liberty or property." 50 U.S.C. app. § 1989b–7(2)(B)(i). Therefore, the court looks to prior examinations of liberty and deprivation of liberty by the United States Supreme Court. In the Fifth Amendment to the United States Constitution it is mandated that: "No person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend V. The following often quoted statement is illustrative:

the full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints.

*Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J. dissenting) (citations omitted). *See also Albright v. Oliver,* 510 U.S. 266, 287, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Souter, J. concurring) (quoting *Poe v. Ullman,* 367 U.S. at 543, 81 S.Ct. 1752); *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 848, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (O'Connor, J.) (quoting *Poe v. Ullman,* 367 U.S. at 543, 81 S.Ct. 1752); *Baker v. McCollan,* 443 U.S. 137, 147, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (Blackmum, J. concurring) (quoting *Poe v. Ullman,* 367 U.S. at 543, 81 S.Ct. 1752).

Furthermore, the United States Supreme Court has elaborated on constitutional due process as follows:

The Due Process Clause of the Fifth Amendment provides that "No person shall ... be deprived of life, liberty, or property, without due process of law...." This Court has held that the Due Process Clause protects individuals against two types of government action. So-called "substantive due process" prevents the government from engaging in conduct that "shocks the conscience," *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952), or interferes with rights "implicit in the concept of ordered liberty," *Palko v. Connecticut,* 302 U.S. 319, 325–326, 58 S.Ct. 149, 82 L.Ed. 288 (1937). When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). This requirement has traditionally been referred to as "procedural" due process.

*United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (alterations in original). Moreover, an understanding of the concept of due process can be obtained from prior experience, purpose and application:

history reflects the traditional and common-sense notion that the Due Process Clause, like its forebear in the Magna Carta, *see* Corwin, The Doctrine of Due Process of Law Before the Civil War, 24 Harv. L.Rev. 366, 368 (1911), was " 'intended to secure the individual from the arbitrary exercise of the powers of government,' " *Hurtado v. California,* 110 U.S. 516, 527, 4 S.Ct. 111, 28 L.Ed. 232 (1884) (quoting *Bank of Columbia v. Okely,* 4 Wheat. (17 U.S.) 235, 244, 4 L.Ed. 559 (1819)). *See also Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government, *Dent v. West Virginia,* 129 U.S. 114, 123, 9 S.Ct. 231, 32 L.Ed. 623, (1889)"); *Parratt v. Taylor,* 451 U.S. 527, 549, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), (Powell, J., concurring in result). By requiring the government to follow appropriate procedures when its agents decide to

---

mate balance of positive and negative evidence regarding the merits of an issue material to the determination of eligibility." On the contrary,

here the evidence overwhelmingly, although not entirely, supports the ORA's decision. 122 F.3d at 1051.

"deprive any person of life, liberty, or property," the Due Process Clause promotes fairness in such decisions. And by barring certain government actions regardless of the fairness of the procedures used to implement them, *e.g., Rochin, supra*, it serves to prevent governmental power from being "used for purposes of oppression," *Murray v. Hoboken Land & Improvement Co.*, 18 How. (59 U.S.) 272, 277, 15 L.Ed. 372 (1855) (discussing Due Process Clause of Fifth Amendment).

*Daniels v. Williams*, 474 U.S. 327, 331–32, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

The United States Supreme Court has recognized that an individual has a liberty interest in being free from incarceration absent a criminal conviction or a proper warrant fulfilling constitutional due process requirements. *See Baker v. McCollan*, 443 U.S. 137, 144, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (although plaintiff "was indeed deprived of his liberty for a period of days," the deprivation was accomplished by due process); *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (once a defendant is convicted, that defendant is constitutionally deprived of the liberty interest in being free from confinement). "Indeed, the paradigmatic liberty interest under the due process clause is freedom from incarceration." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir.1992). In the context of confinement to a mental institution, the United States Supreme Court stated, in *Foucha v. Louisiana*, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), that:

Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action. *Youngberg v. Romeo*, 457 U.S. 307, 316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). "It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones, supra*, 463 U.S., at 361, 103 S.Ct. 3043 (internal quotation marks omitted). We have always been careful not to "minimize the importance and fundamental nature" of the

individual's right to liberty. *Salerno, supra*, 481 U.S., at 750, 107 S.Ct. 2095.

*Id.* at 80, 112 S.Ct. 1780.

In order to analyze the unusual circumstances of the Japanese–Americans interned during World War II, the court must examine analogous legal circumstances of persons who have been deprived of liberty and taken into the custody of the state. Custody occurs either upon formal arrest or under any other circumstances when the suspect is "otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (custody occurs "as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'") (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)). Whether a suspect was in constructive custody depends upon "the totality of the circumstances." *California v. Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517. The United States Supreme Court has also explained that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation." *Berkemer v. McCarty*, 468 U.S. at 442, 104 S.Ct. 3138; *see also United States v. Lennick*, 917 F.2d 974, 977 (7th Cir.1990) (The test is "not whether the defendant was under the subjective belief that his or her movements were restricted, but whether a reasonable person in the defendant's position would believe that he or she was free to leave.").

An examination of the facts in the instant case illustrates, by analogy, that given the "totality of circumstances," on June 5, 1945, when the claimant Carole Seno Song was born, the Seno family believed they still were prohibited from returning to their West Coast home, and it was reasonable for them to believe they were under the custody and restricted supervision of the United States authorities to whom they had to report their whereabouts.

The report issued by the commission that Congress established in 1980, the Commission on Wartime Relocation and Internment of Civilians, denominates Seabrook Farms

residents as "evacuees" and describes conditions at Seabrook Farms:

> Seabrook Farms in New Jersey, the largest single employer of ethnic Japanese, took 1,500 workers into farming and processing food. Several evacuees recalled the long hours, camp-like conditions, and hostility from surrounding communities that marked Seabrook.

*Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians* 206 (1982) (footnotes omitted) ("The internees welcomed Seabrook as an opportunity to escape camp life, restore traditional family life, and earn relatively decent wages while awaiting word of their ultimate fate; at the same time, it must be recognized that conditions at Seabrook were far less attractive than those of ordinary liberated life." *Id.* at 313.). It is also evident from contemporaneous records available to the court, that Seabrook Farms was a facility in which the United States had substantial involvement and that the facility was utilized to "intern" Japanese aliens during and after World War II pending their deportation to Japan. *See Zenzo Arakawa v. Clark,* 79 F.Supp. 468, 470 (E.D.Pa.1947) ("Upon their refusal to leave the United States within the thirty day period after receiving their notices to depart, the [Japanese aliens] were apprehended and, pending their removal to Japan, sent to Seabrook Farms, Bridgeton, New Jersey, in which place they were interned at the time of the filing of this petition on January 27, 1947. Seabrook Farms are under the immediate supervision and control of Henry W. Beachwell, Chief Detention Officer, one of the respondents named in the petition.").

In addition, the United States owned the land and housing occupied by the Japanese–Americans at Seabrook Farms. *See HUD Section 8 Program: Hearing of the Employment and Housing Subcommittee of the House Government Operations Committee,* 101st Cong. (1989), *published in* Federal News Service, June 20, 1989 (statement of Bruce Peterson, Mayor of Upper Deerfield Township, New Jersey) ("Seabrook Farms as a food processor was considered to be essential to the war effort and housing was neces-sary to provide shelter for its workers, the Federal Public Housing Authority in 1944 leased 40 acres of land from Seabrook and on it constructed 35 buildings containing a total of 200 apartments and 11 dormatory [sic] buildings in which there were 85 apartments and 124 sleeping rooms...."); *see also* H.R.Rep. No. 101–977 (1990) (noting the same facts and testimony by Mayor Peterson on housing at Seabrook Farms).

Carole Seno Song was born on June 5, 1945, in Bridgeton, New Jersey while her parents were en route from Seabrook Farms to the Bridgeton hospital. On October 26, 1944, Masami Seno had been granted "indefinite leave-employment" to continue working at Seabrook Farms. At the same time, Toshiko, Wayne and Glenn had been given leave and permitted to join Masami Seno at Seabrook Farms. As a condition of leave, the Senos had to agree to keep the War Relocation Authority informed of any change of address, so the federal government had knowledge of where the Seno family was located. The Senos resided in company housing at Seabrook Farms, in Bridgeton, New Jersey. The plaintiff has alleged that when Carole Seno Song was born, the Senos believed they were under the jurisdiction of the War Relocation Authority and could be returned at any time to the Rohwer Relocation Center. This fact is not disputed by the government, but the defendant does argue that there were no legal barriers to preventing the Seno family from returning to their original domicile in California as of January 20, 1945 and at the time the plaintiff was born.

■ As discussed above, under the statutory framework of the Civil Liberties Act, the claimant is given the benefit of the doubt as to facts that are pertinent to the inquiry, premised upon a balancing of positive and negative evidence. In this case, the government has not rebutted Carole Seno Song's allegations that the Seno family believed at the time of the claimant's birth that they were under the custody and control of the United States. *See* 50 U.S.C. app. § 1989b–4(a)(3). In addition, the government agrees that the United States did not provide personal notice about the lifting of the exclusion

orders to those who had been excluded from the West Coast, but, instead, relied on publication in the Federal Register and newspaper coverage to provide notice.

The Code of Federal Regulations is a codification of the Federal Register. 44 U.S.C. § 1510(b) (1994). Generally, publication in the Federal Register "is sufficient to give notice of the contents of the document to a person subject to or affected by it." 44 U.S.C. § 1507 (1994); *see Wolfson v. United States*, 204 Ct.Cl. 83, 94, 492 F.2d 1386, 1392 (1974). Moreover, the United States Supreme Court has written that "[j]ust as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents. 49 Stat. 502, 44 U.S.C. § 307." *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Similarly, this court's predecessor, the United States Court of Claims, noted that "[p]ublication of rulings and regulations in the Federal Register is notice to all of the world." *Lynsky v. United States*, 130 Ct.Cl. 149, 153, 126 F.Supp. 453, 455 (1954).

This court, however, is troubled when the government relies on general notice in situations involving deprivations of personal liberty to announce an individual's return to unfettered status. Individuals, such as the Senos, who believed they were in custody, or under the control of the United States government, should not be expected to obtain notice of their restored personal freedom and liberty from the Federal Register or other general publications, which they might never see, and which in fact, in an unrebutted allegation, the plaintiff states the Seno family did not see. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315, 70 S.Ct. 652, 94 L.Ed. 865 (1950).[9] The United States Supreme Court wrote in *Mullane:* "But when notice is a person's due,

process which is a mere gesture is not due process." *Id.* at 315, 70 S.Ct. 652. Not only did the Senos live in "camp-like conditions" in housing built, owned and managed by the United States while working at Seabrook Farms, but prisoners of war and enemy aliens were also interned at that same location. It is certainly reasonable that those Japanese–Americans on leave to Seabrook Farms, such as the Senos, believed that they were under the control of the United States and not free to leave at the time plaintiff was born on June 5, 1945.[10] The belief of being in custody on the part of the Senos, as alleged by the plaintiff and not rebutted in the record before the court, combined with the statutory benefit of the doubt afforded the plaintiff pursuant to 50 U.S.C. app. § 1989b–4(a)(3), meets the standard of the reasonably objective individual in similar circumstances who believes they are in the custody of the state, delineated by the United States Supreme Court in *Berkemer v. McCarty*, 468 U.S. at 442, 104 S.Ct. 3138.

An examination of the War Relocation Authority's efforts after the cutoff date promulgated by ORA, namely January 20, 1945, also suggests that the United States retained control over the claimant's family at the time of Carol Seno Song's birth on June 5, 1945. According to a December 18, 1944 statement of Secretary Harold L. Ickes, the United States had "uprooted" internees "from their homes," relocated them throughout the country, and they were "substantially deprived of an opportunity to lead a normal life." Moreover, the government was only willing to provide financial assistance to those individuals who wanted to return to their original domicile after "approv[al]" from the War Relocation Authority, as follows:

> However, only those whose specific plans for resettlement in the evacuated area are approved by the WRA will be eligible for travel assistance which the Authority now

---

**9.** In *Mullane*, the Supreme Court acknowledged the importance of notice to protect potential property rights, which suggests that such protections should be warranted to a greater extent and more carefully guarded when an individual's personal due process rights and personal liberty are impacted. *See Ishida v. United States*, 59 F.3d at 1230 n. 3.

**10.** Defendant conceded at oral argument that if Ms. Song had been born in a "relocation camp" after the January 20, 1945 cutoff date, she would have been viewed as deprived of liberty and eligible for redress under the Civil Liberties Act.

extends to those relocating in other parts of the country. This includes the payment of rail or bus fare to the point of relocation and transportation of personal properties such as household furnishings. Since most of the evacuees at the relocation centers have had little opportunity to accumulate savings over the past two and a half years, they will doubtless need such assistance. Only a few evacuees therefore are expected to leave the centers, either for the West Coast or any other destination, without first having their plans checked and approved by the WRA.

Furthermore, as quoted above, Secretary Ickes outlined how the War Relocation Authority established detailed plans for keeping the westward relocation movement on a "gradual, orderly and systematic basis," including a deliberate attempt to encourage persons of Japanese descent to relocate in parts of the country other than the West Coast. The deliberate, gradual relocation strategy implemented by the United States, coupled with the failure of the government to inform individuals such as the members of the Seno family that the restrictions had been lifted, constituted a perpetuation of the status quo, namely, the deprivation of personal liberty.

The circumstances of a family, such as the Senos, who were located at Seabrook Farms, who were required to inform the government of their location and movement, who lived in government constructed housing, who worked alongside prisoners of war and foreign aliens held in custody by the government, mandates more than "gestures" of notice. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. at 315, 70 S.Ct. 652. The government's argument that adequate notice to the Seno family is found in the general publication in the Federal Register, West Coast military zone general newspapers and Japanese newspapers (e.g., *Pacific Citizen, Salt Lake City Tribune, San Francisco Chronicle,* and *Spokesman's Review*), large urban newspapers (e.g., *Chicago Tribune, Cleveland Plain Dealer, Columbus Dispatch, Denver Post, New York Times*), and newspapers in states where internment camps were located (e.g., *Arkansas Gazette, Arizona Republic*), but notably not in New Jersey, where the Senos were on work leave, does not refute that the Senos believed they remained under the control of the government on June 30, 1945 when Carole Seno was born. General publication without individual notice that the Seno family's deprivation of liberty, forced upon them by the United States government, had been lifted was insufficient to satisfy due process requirements.

The insufficiency of this general notice policy is apparent in that the federal government had the information and the capacity to inform individuals. Notably, by the time the general notice was announced, the government had lists of every Japanese–American interned and their location, as is evident in the numerous lists filed with the court as part of the administrative record, and as noted by the Commission on Wartime Relocation and Internment of Civilians:

> An essential part of ending exclusion, the Departments of War and Justice began to develop lists of individual evacuees. Separately enumerated were Japanese aliens under segregation parole orders prohibiting them from leaving Tule Lake Segregation Center; ordinary parolees at Tule Lake who might be excluded from military areas; Japanese aliens paroled under Immigration Service safeguards that forbade their return to the Coast; and individuals under ordinary parole outside Tule Lake who might be excluded from the West Coast.... On December 9 the Western Defense Command delivered to the Chief of Staff a list of persons it thought had to be excluded from critical areas of the [W]estern [D]efense [C]ommand and detained in a camp similar to Tule Lake. The list consisted of 4,963 persons, of whom 3,066 were in the Tule Lake Segregation Center; others were in a number of other camps; 510 were unaccounted for. The Army suggested to Dillon Meyer that the number might grow to approximately 5,500....

*Personal Justice Denied; Report of the Commission on Wartime Relocation and Internment of Civilians* 234 (1982) (footnotes omitted). Proclamation No. 21, similarly stated that "[a]vailable information permits the de-

termination of potential danger on an individual basis," 10 Fed.Reg. 53, thereby indicating that the government was reviewing the individual status of every person encompassed by the original exclusion orders, starting with Proclamation No. 1, 7 Fed.Reg. 2320.

The Seno family's belief, asserted by the plaintiff and uncontroverted in the record before the court, that they remained in custody is objectively reasonable considering the totality of the circumstances. Because plaintiff's family actually were in a detention facility, previously at an internment camp in Arkansas, and then granted "indefinite leave-employment" with an obligation to report all personal movements to the federal government, underscores the obligation of the United States to provide personal notice when the Seno's were no longer deprived of their freedom and liberty. The United States knew the location of the Seno family and the father Masami Seno's place of work, since the family had to report to the War Relocation Authority their whereabouts in order to be granted work leave. Moreover, the government had complied a "white list" of those individuals who were considered free to return to their former homes once the restrictions were lifted. General publication is inadequate when involving a deprivation of liberty, especially in the case of the Seno family who were in a rural farming community in southern New Jersey and there is no evidence in the record that these publications noted by the ORA in the regulatory preamble, and listed above, were widely disseminated. *See* 62 Fed.Reg. 19930–31.

Justice Ginsburg noted, in *Albright v. Oliver*, how the power of the state even over an individual who is not incarcerated, but rather duty bound to report to the state his or her whereabouts or travel pending trial, is tantamount to a deprivation of liberty:

A defendant incarcerated until trial no doubt suffers greater burdens. That difference, however, should not lead to the conclusion that a defendant released pretrial is not still "seized" in the constitutionally relevant sense. Such a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed "seized" for trial, so long as he is bound to

appear in court and answer the state's charges. He is equally bound to appear, and is hence "seized" for trial, when the state employs the less strong-arm means of a summons in lieu of arrest to secure his presence in court.

510 U.S. at 279, 114 S.Ct. 807 (footnote omitted) (Ginsburg, J. concurring).

Secretary of the Interior Harold L. Ickes, released a statement, the day after Proclamation No. 21 rescinding the restriction orders was issued, in which he explained the mandate of the War Relocation Authority regarding Japanese–American internees:

They are entitled to their full constitutional and legal rights, and perhaps to something more than ordinary consideration because they have really suffered as a direct result of the war. In a real sense, these people, too, were drafted by their country. They were uprooted from their homes and substantially deprived of an opportunity to lead a normal life. They are casualties of war.

It is the responsibility of every American worthy of citizenship in this great Nation to do everything that he can to make easier the return to normal life of these people who have been cleared by the Army authorities. By our conduct towards them we will be judged by all of the people of the world.

It is apparent from the instant case, however, that the United States not only failed to endeavor to make the return of liberties and freedom to the Seno family "easier," but, in fact, failed to inform them of the restoration of their free status. The Seno family continued their existence at Seabrook Farms, including at the time of Carol Seno Song's birth, with the perception that they were still subject to the custody of the United States. The actions of the government to control and curtail the return of Japanese–American evacuees to the West Coast even after restrictions were lifted, combined with the lack of personal notice to the Seno family, is not demonstrative of a return of "full constitutional and legal rights" or "something more than ordinary consideration because they have really suffered."

■ In the opening paragraph of *Ishida v. United States*, the United States Court of Appeals for the Federal Circuit emphasized the relevant statutory period chosen by Congress in the Civil Liberties Act as December 7, 1941 to June 30, 1946. 59 F.3d at 1226. In fact, these unambiguous threshold dates are found twice in the Civil Liberties Act at 50 U.S.C. app. § 1989b–7(1) & (2)(B)(ii). The first reference defines the time period covered by the statute, specifically, "the term 'evacuation, relocation, and internment period' means that period beginning on December 7, 1941, and ending on June 30, 1946." 50 U.S.C. app. § 1989b–7(1). The second reference is encompassed in an alternative statutory definition of an "eligible individual" under the Civil Liberties Act, requiring that such a person during the "evacuation, relocation, and internment period" (quoted above) was "enrolled on the records of the United States Government during the period beginning on December 7, 1941, and ending on June 30, 1946, as being in a prohibited military zone." 50 U.S.C. app. § 1989b–7(2)(B)(ii). Moreover, there is nothing in the statute that indicates Congress intended to utilize a January 20, 1945 threshold date as selected by the ORA in its revised regulations. *See* 28 C.F.R. § 74.3(b)(9).

The statutory language of the Civil Liberties Act specifically defines the "evacuation, relocation, and internment period" as starting on December 7, 1941, and ending on June 30, 1946. 50 U.S.C. app. § 1989b–7(1). The totality of the circumstances presented by the plaintiff, Carole Seno Song, who was born before June 30, 1946, satisfies the time requirements during which she was "confined, held in custody, relocated, or otherwise deprived of liberty or property" pursuant to the statute. 50 U.S.C. app. § 1989b–7(2)(B)(i). The January 20, 1945 date selected in the ORA's revised regulations, would prevent compensation to the plaintiff, despite the apparent congressional intent in the Civil Liberties Act to provide for children, born after relocation and prior to June 30, 1946, who were deprived of their basic civil liberties. *See also Ishida v. United States*, 59 F.3d at 1229–30.

This incongruity between the statutory date and the date chosen in the regulations is an impermissible construction of the Civil Liberties Act by the ORA. This court is bound to follow the clear and plain language of the statute that presents a June 30, 1946 cutoff date. *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress ...."). The date of January 20, 1945 selected by the ORA in the revised regulations, that would arbitrarily limit the eligibility of Carole Seno Song in the face of Congress' selected date of June 30, 1946, "would render superfluous and devoid of meaning the alternative basis of recovery, i.e., being 'otherwise deprived of liberty.'" *Ishida v. United States*, 59 F.3d at 1230. There is nothing in the statutory language to indicate that Congress intended to exclude children, such as Carole Seno Song, born after their families were relocated but before June 30, 1946, from eligibility under the Civil Liberties Act. The ORA's regulatory determination avoids the clear language of the statute, would render superfluous portions of the statute, and is logically inconsistent with the goals of Congress to be inclusive about providing redress to affected individuals for violations of their basic civil liberties in accordance with the dates Congress identified in the Civil Liberties Act.

## CONCLUSION

■ This court, therefore, finds that pursuant to the language of the Civil Liberties Act, consistent with the United States Court of Appeals for the Federal Circuit decision in *Ishida v. United States*, and the Due Process Clause jurisprudence of the United States Supreme Court, Carole Seno Song is an "eligible individual" entitled to receive compensation pursuant to 50 U.S.C. app. §§ 1989b–4(a)(1), 1989b–7.

The plaintiff's motion for summary judgment based upon the administrative record is **GRANTED**. The defendant's motion for summary judgment based upon the administrative record is **DENIED**. Plaintiff shall

receive judgment in the amount of $20,000.00 as provided for in the Civil Liberties Act at 50 U.S.C. app. § 1989b–4(a)(1).

IT IS SO ORDERED.

