Carol Judy HIGASHI

v.

**The UNITED STATES.**

**No. 98–639C.**

United States Court of Federal Claims.

July 7, 1999.

Julia Harumi Mass, Pasadena, California, attorney of record, for the plaintiff.

Geoffrey J.L. Brown, Washington, D.C., with whom was Acting Assistant Attorney, General David W. Ogden, for the defendant. Tink D. Cooper, Office of Redress Administration, of counsel.

## OPINION

YOCK, Judge.

This Japanese internment case comes before the Court on the plaintiff's and the defendant's cross-motions for summary judgment, pursuant to United States Court of Federal Claims Rule ("RCFC") 56. The plaintiff contends that the Civil Liberties Act of 1988 entitles her to redress payment and an apology as the result of the Federal Government excluding her from her parents' original place of residence, Sacramento, California, during World War II. For the reasons set forth below, the defendant's motion is granted, the plaintiff's motion is denied, and the plaintiff's Complaint is to be dismissed.

### Factual Background

This case involves the Federal Government's policy concerning persons of Japanese ancestry during World War II ("WWII"), as well as the Government's attempt to atone for that policy many years later. Although the plaintiff was a child of internment victims, the timing of her birth after the termination of the internment policy resulted in no legal detriment meriting award to the plaintiff under the Government's statutory program.

On February 19, 1942, President Franklin D. Roosevelt signed Executive Order No. 9066, 3 C.F.R. 1092–93 (1938–1943), which permitted the Secretary of War to exclude any groups of people from designated military areas. Under that Executive Order, the United States Government prevented persons of Japanese ancestry from living, work-ing, or traveling on the West Coast. In the implementation of this prohibition policy, the United States Army ("Army") removed citizens of Japanese ancestry and their resident alien parents to "relocation centers"—barracks camps surrounded by barbed wire and under military guard. The War Relocation Authority ("WRA"), a civilian agency, administered the camps.

On December 17, 1944, Public Proclamation No. 21, 10 Fed.Reg. 53 (1945); see also 62 Fed.Reg. 19,928, 19,931 (1997), rescinded the mass exclusion orders and replaced them with individual exclusion orders. The Western Defense Command ("WDC") placed 4,963 individuals on the individual exclusion lists. See Administrative Record ("AR") at 42. The Army revoked the remaining individual exclusion orders with Public Proclamation No. 24, issued on September 4, 1945. See 10 Fed.Reg. 11,760 (1945).[1]

In ending the Japanese internment policy, the United States sought to slow resettlement in the evacuated areas and to disperse some of the evacuees across the country in order to avoid a concentration of the minority group on the West Coast. Mr. Harold L. Ickes, the Secretary of the Interior, stated in a press release on December 18, 1944, however, that "[p]eople of Japanese ancestry both at the relocation centers and elsewhere who have been found eligible by the [WDC] for residence in the West Coast area are of course free to go back at any time." AR at 69.

One of the families affected by the Government's internment policy during WWII was the plaintiff's immediate family, the Tsumuras. Pursuant to Executive Order No. 9066, the plaintiff's parents and older sisters were evacuated from their home in Sacramento, California, and interned at the Tule Lake relocation center ("Tule Lake") in northern California. On June 1, 1943, the plaintiff's father ("Mr. Tsumura") was granted a work

---

**1.** Aliens continued to be subject to various restrictions until December 7, 1945. At that time, President Truman's Proclamation No. 2674, 3 C.F.R. 71 (1943–1948), revoked Proclamation No. 2525, see 3 C.F.R. 273 (1938–1943). Proclamation No. 2525, issued December 7, 1941, by President Roosevelt, restricted aliens of Japanese ancestry in travel, the opportunity for membership in organizations, and the ability to possess weapons, radios, cameras, and papers. See Pl.'s Proposed Findings of Uncontroverted Fact at ¶ 10.

furlough from Tule Lake and moved to Boise, Idaho, to work as an automobile mechanic. Upon his arrival in Boise, Mr. Tsumura checked in with the WRA. Mr. Tsumura believed that the Government never made him or his family aware that his indefinite leave was permanent.[2] He understood that the Government provided his work furlough subject to travel restrictions and that he was to return to Tule Lake if he lost his job.

Mr. Tsumura's family reunited and grew in Boise, Idaho. On July 5, 1943, the plaintiff's mother ("Mrs. Tsumura") and sisters received indefinite leave from Tule Lake and permission to join Mr. Tsumura in Idaho. On February 6, 1945, while in Boise, Mrs. Tsumura gave birth to the plaintiff. The plaintiff is currently a United States citizen of Japanese ancestry.

While in Boise, the Tsumuras continued to believe that they fell under the jurisdiction of the WRA and that the Government could compel them to return to Tule Lake at any time. As an example, the plaintiff points to a particular time between 1943 and 1945 when her mother attempted to purchase a kitchen knife in a store, which resulted in the store owner calling the FBI and the police. *See* Pl.'s Proposed Findings of Uncontroverted Fact at ¶ 43. Those agencies looked to the WRA as the authority to decide whether or not Mrs. Tsumura could purchase the knife. Even though the WRA apparently cleared up the dispute by showing that Mrs. Tsumura was not subject to any such restrictions similar to those imposed on aliens by Proclamation No. 2525, *see supra* note 1, this incident led the family to believe that the WRA maintained jurisdiction over them.

The family also considered themselves internees because of a visit Mr. Tsumura made to Tule Lake in July 1945. Mr. Tsumura had stated that he returned to Tule Lake with his family and that, while there, the family considered themselves internees. *See* AR at 210, 214. However, there is no formal documentation in Government files showing when Mr. Tsumura came to Tule Lake, with whom he traveled, or how long he stayed at Tule

Lake. The files instead suggest that Mr. Tsumura went to Tule Lake in July 1945 in order to pick up the plaintiff's grandparents, who had received terminal leave with a relocation grant to move to Idaho, and that he returned with them to Boise on July 17, 1945. *See* AR at 126. The Tsumuras could not have been legally reinducted at Tule Lake because the WRA policy, as of February 1, 1945, prohibited all further reinductions or inductions of residents to the relocation centers. *See* AR at 36, 51.

Until January 1946, when the Tsumuras indicated that they learned from relatives that they could move back to California, the family was apparently unaware that the Government had eliminated the military exclusion of persons of Japanese ancestry from California. The plaintiff points out that the WRA knew the Tsumura's residential address and Mr. Tsumura's work address, but that neither the WRA nor any other agent of the Government gave them actual notice about the lifting of the exclusion. *See* Pl.'s Proposed Findings of Uncontroverted Fact at ¶ 45. The defendant counters that the Government provided widespread public notice of the lifting of the exclusion restrictions in December 1944 and January 1945. The Associated Press Wire Service distributed news of the release of Public Proclamation No. 21 nationally on December 17, 1944. Within two days, all the major newspapers in the United States prominently reported the lifting of the exclusions. *See* 62 Fed.Reg. 19,928, 19,930 (1997). Dissemination of Public Proclamation No. 21 included its publication in Japanese–American newspapers, *see id.* at 19,931, and in the Idaho Daily Statesman, which was published and circulated in Boise, Idaho. *See* Def.'s Reply in Supp. of It's [sic] Opp'n to Pl.'s Reply in Supp. of S.J. on the AR and Def.'s Cross–Mot. for J. Upon the AR, App.A. The Daily Statesman ran the story on its front page, trumpeting the proclamation in large print: "U.S. Revokes Order Excluding All Nisei from Pacific Coast." *Id.* Furthermore, the Government published Public Proclamation No. 21 in the

---

**2.** Evacuees granted indefinite leave were considered to have departed from the custody of the WRA. *See* AR at 34.

Federal Register on January 2, 1945. *See* 10 Fed.Reg. 53 (1945). The administrative record contains a two-and-a-half page letter written by Mr. Tsumura in grammatically correct English, which was undated but apparently written before 1946, *see* AR at 38–40, and the plaintiff does not dispute the fact that her father read and understood English in 1944 and 1945. *See* Hearing Tr. at 4–5. Thus, sources accessible to the Tsumuras contained information about the revocation of the exclusion order.

The plaintiff in this case seeks to receive restitution and an apology under the Civil Liberties Act ("the Act").[3] On October 20, 1992, the Office of Redress Administration ("ORA") of the U.S. Department of Justice ("DOJ"), Civil Rights Division, denied the plaintiff's claim under the Act, reasoning that the plaintiff's losses were not the result of Government action as defined by the Act and implementing regulations. The ORA reaffirmed its denial of her claim on October 7, 1993. As the result of a new standard set forth by the United States Court of Appeals for the Federal Circuit in *Ishida v. United States*, 59 F.3d 1224 (Fed.Cir.1995), the ORA again reviewed the plaintiff's claim. The claim was again denied on June 16, 1997, and the Appellate Section of the DOJ, Civil Rights Division, affirmed the ORA's denial on March 19, 1998. Thereafter, on August 7, 1998, the plaintiff filed her Complaint seeking review with this Court.

## Discussion

I. The Civil Liberties Act of 1988 and Subsequent Regulation

The plaintiff claims that she has suffered a deprivation of liberty qualifying her for redress under the Civil Liberties Act of 1988. The Court views her claims in the context of the legal framework that Congress and the

DOJ created to redress the harms done to victims of the wartime internment policy.

### A. The Act

The Civil Liberties Act of 1988 provides for the acknowledgment of "the fundamental injustice of the evacuation, relocation, and internment of United States citizens and permanent resident aliens of Japanese ancestry during World War II[,]" and for the apology to those individuals on behalf of the United States. 50 U.S.C.App. §§ 1989(1),(2) (1988). The Act also established a fund to be used in part for payments of $20,000 to each eligible individual. *See id.* at §§ 1989b–3, 1989b–4(a)(1).[4]

The Act defines the term "evacuation, relocation, and internment period" as the time period beginning on December 7, 1941, and ending on June 30, 1946. *Id.* at § 1989b–7(1). The Act defined the term "eligible individual" as:

any individual of Japanese ancestry who is living on the date of the enactment of this Act [August 10, 1988] and who, during the evacuation, relocation, and internment period—

(A) was a United States citizen or a permanent resident alien; and

(B) (i) was confined, held in custody, relocated, or otherwise deprived of liberty or property as a result of—

(I) Executive Order Numbered 9066, dated February 19, 1942;

(II) the Act entitled "An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones", approved March 21, 1942 (56 Stat. 173); or

(III) any other Executive order, Presidential proclamation, law of the United States, directive of the Armed Forces of the United

---

3. The plaintiff's parents and two sisters received restitution and an apology under the Act. *See* AR at 48; Hearing Tr. at 22–23.

4. Pursuant to the terms of the statute, the fund terminated on August 10, 1998, 10 years after the date of the enactment. *See* 50 U.S.C.App. § 1989b–3(d). Additionally, in the original statute, the duties of the Attorney General were to

cease upon termination of the fund. However, the 1992 amendments revised this requirement so that the duties terminated 180 days after the termination of the fund. *See* 50 U.S.C.App. § 1989b–4(e) (1994). Although the Attorney General's duties in this matter thus terminated on February 8, 1999, the defendant agreed to continue to defend this case on the merits.

States, or other action taken by or on behalf of the United States or its agents, representatives, officers, or employees, respecting the evacuation, relocation, or internment of individuals solely on the basis of Japanese ancestry; or

(ii) was enrolled on the records of the United States Government during the period beginning on December 7, 1941, and ending on June 30, 1946, as being in a prohibited military zone[.]

*Id.* at § 1989b–7(2).

The Attorney General is obligated to pay monies to eligible individuals only. *See id.* at § 1989b–4(a)(1). Thus, it would be insufficient for an individual merely to fall within the temporal boundaries of December 7, 1941, and June 30, 1946. They would also have to demonstrate that they fell within one of the enumerated categories of section 1989b–7(2). As will be explained, the section defining eligible individuals relies on legal action taken by the Federal Government in connection with the internment program. *See* Part 2.B., *infra.*

### B. Act Amendments

In 1992, Congress amended the Act. One amendment changed the definition of "eligible individual" to include the spouses and parents of persons of Japanese ancestry. *See* 50 U.S.C.App. § 1989b–7(2). The amendment requires only that these individuals be United States citizens or permanent resident aliens confined, held in custody, relocated, or otherwise deprived of liberty or property by any of the Government authorities listed in the definition of "eligible individual" in the 1988 Act. *See* 50 U.S.C.App. § 1989b–7(2) (1994).

Congress also added a standard by which one may determine whether a claimant is eligible in cases where there is an approximately even balance of positive and negative evidence concerning a material issue affecting eligibility. That standard provides the benefit of the doubt in resolving those issues to the person claiming eligibility. *See* 50 U.S.C.App. § 1989b–4(a)(3).

Congress further amended the Act to give this Court exclusive jurisdiction for judicial review of the denial of a claim after September 27, 1992. The judicial review provision provides:

A claimant may seek judicial review of a denial of compensation under this section solely in the United States Court of Federal Claims, which shall review the denial upon the administrative record and shall hold unlawful and set aside the denial if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

*Id.* at § 1989b–4(h)(1).

### C. Regulatory Framework

In 1989, the Attorney General promulgated regulations to implement the Act's redress provisions. The regulations established the Office of Redress Administration ("ORA") within the DOJ's Civil Rights Division to execute the Attorney General's responsibilities under the Act. *See* 28 C.F.R. § 74 (1989). The ORA is responsible for verifying and providing notification of eligibility for payment. *See id.* at §§ 74.7, 74.8. Those persons that the ORA found to be ineligible may appeal to the Assistant Attorney General for the Civil Rights Division, and the Assistant Attorney General's decision to affirm a denial of eligibility constitutes final administrative action with respect to the appeal. *See id.* at §§ 74.15, 74.16.

The regulations further identify the types of individuals who are deemed to have suffered a loss entitling them to compensation under the Act. *See id.* at § 74.3(b). In *Ishida,* the Federal Circuit reviewed the ORA's policy of denying the claims of children born to parents of Japanese ancestry (unless the child was seeking redress as an heir) where the parents had been evacuated from the West Coast but were not in a relocation center or internment camp at the time they gave birth to the child. The court determined that if an individual was born after the relocation and was excluded by law from returning to the parents' place of residence, the individual was entitled to a redress payment. *See Ishida,* 59 F.3d at 1230. The Federal Circuit found that the DOJ's regulations implementing the Act were broader than the ORA's policy, stating:

Under 28 C.F.R. § 74.3, the DOJ deems eligible several categories of individuals who were not "confined, held in custody, [or] relocated." Additionally, subsection 74.3(c) expressly states that these categories are "not an exhaustive list of individuals who are deemed eligible for compensation." This section appears to be consistent with the Act.

*Id.* at 1229.

In *Ishida*, the plaintiff was born on November 23, 1942, more than two years before Proclamation No. 21 removed the laws excluding persons of Japanese ancestry from returning to the West Coast. *See id.* at 1228. The *Ishida* court noted that section 1989b–7(2)(B)(i) provides that an eligible individual consists of one deprived of liberty or property during the statutory period as a result of, *inter alia,* Executive Order No. 9066 or 56 Stat. 173. The court determined that Executive Order No. 9066 covered the plaintiff and applied the Act accordingly. Such individuals were excluded from their family homes under Executive Order No. 9066 and suffered a grave deprivation of liberty as a direct result of Government action against them. *See Ishida,* 59 F.3d at 1230. Thus, the plaintiff in that case fell into a category of individuals eligible for compensation.

*Ishida* did not make clear, however, the eligibility status of those individuals born after his or her parents relocated and after Proclamation No. 21 took effect on January 20, 1945. After Proclamation No. 21 was promulgated, the families could return to their homes without committing a crime under the criminal statute. As a result of *Ishida,* the ORA amended its regulations to include those individuals born after their family relocated from a prohibited zone but were excluded, by law, from returning to their parents' original place of residence. The agency limited eligibility to:

> [i]ndividuals born on or before January 20, 1945, to a parent or parents who had been evacuated, relocated, or interned from his or her original place of residence in the prohibited military zones on the West Coast, on or after March 2, 1942, pursuant to paragraph (a)(4) of this section, and who were excluded by Executive Order 9066 or

military proclamations issued under its authority, from their parent's or parents' original place of residence in the prohibited military zones on the West Coast.

28 C.F.R § 74.3(b)(9) (1998).

Thus, those individuals had to be born on or before January 20, 1945, the date ORA determined that Proclamation No. 21 became effective. The plaintiff in this case was born on February 6, 1945. The plaintiff here challenges the validity of the regulation and the ORA's denial of her claim. Further, the plaintiff attempts to show that she suffered a deprivation of liberty warranting eligibility under the Act.

## II. Deference to the ORA and the Standard of Review

### A. Summary Judgment Standard

This case is before this Court on cross-motions for summary judgment filed by the plaintiff and the defendant. Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Each moving party bears the initial burden of establishing the absence of any disputes of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party has met its burden of showing entitlement to judgment as a matter of law, the burden then shifts to the nonmoving party to provide facts establishing that a genuine issue for trial exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party cannot discharge its burden by cryptic responses but must show evidence of a dispute of material fact, one which will change the outcome of the litigation. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Facts which are not outcome determinative are not material, and disputes over such facts will not preclude the Court from granting summary judgment in favor of the moving party. *See id.*

## B. *Chevron* Deference

The defendant contends that because Congress expressly delegated to the ORA the power to draft and implement section 74.3(b)(9), the ORA's regulation is entitled to the appropriate deference as outlined in the *Chevron* case. The plaintiff counters that the ORA's definition of eligibility is at odds with the expressed intent of Congress and that, therefore, the ORA's decision in this case must meet a test of reasonableness.

■ In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh'g denied*, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984), the Supreme Court established the standard for federal courts to use when reviewing agency action based on their own promulgated regulations. A federal court must first determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842; *see also Chacon v. United States*, 48 F.3d 508, 511–12 (Fed.Cir.1995). If Congress has expressed its intent, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *see also Chacon*, 48 F.3d at 512.

■ If Congress has not expressly addressed the issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. "If the statute is silent or ambiguous on a point 'considerable weight' and 'substantial deference' must be accorded to the interpretation of a statute by the agency that is responsible for its implementation." *Rosete v. OPM*, 48 F.3d 514, 517 (Fed.Cir.1995) (citing *Rust v. Sullivan*, 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)). A court in upholding the construction of the statute does not need to conclude that the agency's construction was the only one it could have adopted. Instead, the court must defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes they are charged with administering. *See Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740–41, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). This Court will give controlling weight to legislative regulations unless they are arbitrary, capricious, or manifestly contrary to the statute at issue. *See Chevron*, 467 U.S. at 843–44, 104 S.Ct. 2778.

■ In *Ishida*, the issue was whether or not the regulations granted eligibility status to children of internees who could not legally return to their family homes. 59 F.3d at 1226. The laws preventing the return to their family homes were rescinded by Proclamation No. 21. The ORA was, therefore, confronted with clarifying the status of those individuals born after the effective date of the proclamation, January 20, 1945. Congress did not expressly indicate its intent on this issue; therefore, under *Chevron*, this Court must determine whether or not the agency gave a permissible construction of the statute in promulgating its regulations on the issue. *See Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. With the foregoing considerations in mind, the Court finds that the regulation was a permissible and reasonable interpretation of the statute.

The plaintiff in this matter is arguing that this Court should not defer to the pertinent regulations and that, although she may not have suffered a legal detriment, as a practical matter she suffered an internment that falls within the relevant statute and warrants compensation. The plaintiff further contends that the regulation improperly limits the *Ishida* holding to legal restraints and that, therefore, this Court should not grant deference to the ORA because the regulation is arbitrary and capricious. The plaintiff asserts that the *Ishida* holding did not limit deprivations of liberty to legal bars only. If it had, the plaintiff argues, it would have run counter to the language of the Act which equates deprivation of liberty or property with the laws or the actions taken by the United States Government. *See* 50 U.S.C.App. § 1989b–7(2)(B) (1994). In other words, the plaintiff argues, Congress intended to include in these circumstances not only legal bars to an individual's liberty but the practical nonlegal effects and other actions by the Government as well.

However, *Ishida* did limit the exclusions from residence to those occurring as a direct

result of Executive Order No. 9066. The Federal Circuit stated that:

> We hold that such children are entitled to compensation because they were "otherwise deprived of liberty" within the meaning of the Act when they were excluded by law from their parents' "original place of residence" "as a result of" Executive Order 9066 \*\*\* and Act of March 21, 1942 \*\*\* making it a criminal offense to violate Executive Order 9066 by returning to their family homes in areas that had been declared prohibited military zones pursuant to Executive Order 9066.

*Ishida*, 59 F.3d at 1226.

*Ishida* was limited to legal exclusions. To the extent that the plaintiff relies on the additional "action" language found at section 1989b-7(2)(B), she may attempt to show, as discussed at Parts III.A–C, *infra*, that the Government, through other means, deprived her of liberty. However, such a showing will not impact on a *Chevron* analysis of 28 C.F.R. § 74.3(b)(9) because the regulation came about as the result of a holding concerning legal restraints, and the regulation deals solely with legal restraints. *See* 28 C.F.R. § 74.3(b)(9) (stating as criteria for eligibility that the regulation applies to children "who were excluded by Executive Order 9066 or military proclamations issued under its authority"). Thus, the plaintiff's argument that the Government practically restrained her from returning to the West Coast will not prevent this Court from giving controlling weight to the ORA's interpretation of the statute.

The plaintiff also contends that the regulation's cutoff date of January 20, 1945, is arbitrary and capricious and that, therefore, this Court should not accord the ORA's regulation any deference. The ORA, however, did not approach the drafting of this regulation in a haphazard fashion. *Ishida's* holding applied to those individuals who were deprived of their liberty because they could not return to their parents' original residence without committing a criminal offense. However, as of January 20, 1945, Public Proclamation No. 21 rescinded all the laws restricting travel and restricting return to family homes (except for individual exclusions bar-

ring specified individuals from returning to the West Coast, which did not apply to any member of the Tsumura family). After that date, the logic of the *Ishida* case simply no longer applies.

In addition, the ORA took appropriate steps in its crafting of the regulation. The ORA solicited comments to the proposed regulation and responded to some of these comments by making substantive changes and incorporating suggestions where appropriate. *See* 62 Fed.Reg. at 19,930. The agency stated that "[a]lthough the Department is sympathetic to persons who [suffered hardships making it difficult to return safely to the West Coast], it must be recognized that after January 20, 1945, the law ceased to act to deprive affected individuals of their liberty to travel and reside as they saw fit." *See* 62 Fed.Reg. at 19,932.

The DOJ, in fact, gave individuals the benefit of the doubt by selecting this January 1945 cutoff date. Proclamation No. 21 was issued on December 17, 1944, and became effective on January 2, 1945. 10 Fed.Reg. 53 (1945). Persons of Japanese ancestry began returning to the West Coast after December 17, 1944. Except for six small zones maintained by the Army until January 20, 1945, no general legal exclusion for persons of Japanese ancestry existed. *See* 62 Fed.Reg. at 19,931–33. The agency, following the Federal Circuit's logic in *Ishida* and examining the history of the period, created the January 20, 1945 cutoff date. Thus, there is nothing arbitrary or capricious about this date, and the Court must conclude that the regulation was a reasonable response to the *Ishida* ruling and to the statute. Accordingly, this Court gives controlling weight to 28 C.F.R. § 74.3(b)(9). *See Chevron*, 467 U.S. at 644, 104 S.Ct. 2778.

This *Chevron* analysis clashes with the recent decision of *Carole Seno Song v. United States*, 43 Fed.Cl. 621 (1999). In that case, it was determined that the ORA impermissibly construed the Act by promulgating 28 C.F.R. § 74.3(b)(9).

The *Chevron* analysis in that case focused on two aspects of the Act in finding that Congress' intentions were clear. First, the

*Song* court pointed out that the relevant time period in the statute is broader than the time period in the regulation. Second, the *Song* court determined that using the regulation's earlier cutoff date would render another part of the statute meaningless.

The Court in *Song* noted that the statute refers to the December 7, 1941 to June 30, 1946 time period twice. *See Song*, at 644. First, the statute refers to the time period in the definition of the term "evacuation, relocation and internment period." 50 U.S.C.App. § 1989b–7(1). The second reference refers to the definition of an eligible individual as one who during the time period was "enrolled on the records of the United States Government during the period beginning on December 7, 1941, and ending on June 30, 1946, as being in a prohibited military zone." 50 U.S.C.App. § 1989b–7(2)(B)(ii). The *Song* court determined that "[t]his incongruity between the statutory date and the date chosen in the regulations is an impermissible construction of the Civil Liberties Act by the ORA." *Song*, at 645.

In addition, the *Song* court opined that using the regulation's January 20, 1945 date, rather than the June 30, 1946 date would render the phrase "otherwise deprived of liberty," 50 U.S.C.App. § 1989b–7(2)(B)(i), superfluous. *See Song*, at 645. In *Ishida*, the Federal Circuit stated that Congress, by including that phrase in the statute, "necessarily intended that those individuals of Japanese ancestry who were 'deprived of liberty' as a result of the enumerated government actions will be compensated even though they were not 'confined, held in custody [or] relocated.'" 59 F.3d at 1230. The *Song* court concluded in its opinion that:

> "The ORA's regulatory determination avoids the clear language of the statute, would render superfluous portions of the statute, and is logically inconsistent with the goals of Congress to be inclusive about providing redress to affected individuals for violations of their basic civil liberties in accordance with the dates Congress identified in the Civil Liberties Act."

*Song*, at 645.

This Court, however, does not find that Congress' intentions were so clear-cut con-

cerning the Act. That Congress chose to indicate a time period twice in a statute does not mean that that time period applies without qualification to every other part of the statute. Here, the first use of the time period defines the outside parameters of the "evacuation, relocation, and internment period," a term used frequently in the statute. *See, e.g.,* 50 U.S.C.App. § 1989b–1(a). The statute does not permit someone who merely lived during that time period to receive restitution, of course; the term "eligible" is defined at section 1989b–7(2) as someone living "during the evacuation, relocation, and internment period" and the statute proceeds to enumerate other standards that a potential claimant must meet in order to receive restitution.

The second mention of the time period in the statute does not exist in a vacuum either, but requires a claimant to be in a prohibited military zone during a certain time frame. *See* 50 U.S.C.App. § 1989b–7(2)(B)(ii). The mention of these dates in the statute establishes unambiguously that an eligible individual must fall within these broad statutory dates to receive consideration for restitution. However, it is less than clear that Congress expressed an unambiguous intent that the definition of every eligible individual must include the entirety of this broad statutory time frame. In other words, an individual must meet the overall time criteria to be eligible, but the issue is whether or not the DOJ, in construing the definition of eligible individual, may narrow the time period as to some categories of persons who may be eligible.

One could argue, as the *Song* court did, that Congress would have refused to countenance the regulation because to do so would render the "otherwise deprived of liberty" language meaningless. 50 U.S.C.App. § 1989b–7(2)(B)(i). Certainly after *Ishida* that phrase carries legitimate meaning. After all, the Federal Circuit determined that the phrase created an additional ground for compensation besides internment. *See Ishida,* 59 F.3d at 1232. At the bare minimum, the phrase qualifies individuals for eligibility even if they were not evacuated, relocated, or interned, if there was a legal bar prohibiting

them from returning to their residences. *See id.* Children born to internees and legally unable to return to their parents' homes became, after *Ishida,* qualified under the Act, and this status gives meaning to the "otherwise deprived of liberty" language.

Admittedly, it is unclear why Congress would craft a time period that added an additional eighteen months after the Government ended all legal restraints against those people of Japanese ancestry affected by Proclamation No. 21. However, this ambiguity warrants greater deference to the administrative agency promulgating regulations to implement the Civil Rights Act, not less. Perhaps Congress wanted to send a direct signal to those born after the June 30, 1946 date that no unforseen circumstance would bring those individuals into eligibility; or perhaps Congress wished to acknowledge that while legal impediments ended by January 1945, the immediate aftereffects of the wartime internment lasted for a while longer; or maybe Congress wished to recognize the period by the date the WRA was abolished, June 30, 1946. Regardless, the multiple possibilities leave this Court to conclude that the statute is ambiguous about whether or not the time period prevents limitations on eligibility that ultimately narrow the time period. It is therefore appropriate that ORA used its discretion to determine how best to implement the policy in those cases not covered by the statute's specific terms. *See United States v. Haggar Apparel Co.,* 526 U.S. 380, ——, 119 S.Ct. 1392, 1400, 143 L.Ed.2d 480 (1999).

This Court agrees with the *Song* court that Congress' goal was to be inclusive to affected individuals for violations of their basic civil liberties. *See Song,* at 645. This Court also reads *Ishida* to state that restitution for violations of liberty requires some legal restraint. *See* 59 F.3d at 1226 (holding children born to persons of Japanese ancestry within time period eligible when they were "excluded by law" from returning to their family homes). If an agency's interpretation fills a gap or defines a term in a way reasonable in light of the legislation's revealed design, this Court must give that interpretation controlling weight. *See NationsBank of*

*N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 115 S.Ct. 810, 130 L.Ed.2d 740, (1995). Consequently, with all due respect to the *Song* opinion, this Court views the regulation as reasonable and valid and thus not inconsistent with the statute.

### III. The Plaintiff's Eligibility Under the Act

■ Because the plaintiff was born on February 6, 1945, which was after the cutoff date, pursuant to the duly promulgated regulation (28 C.F.R. § 74.3(b)(9)), the plaintiff is not eligible for a redress payment. Nevertheless, the plaintiff contends that she is entitled to redress because certain nonlegal restraints prevented her from returning to California after her birth. Specifically, she claims that the Government did not provide her family with actual notice of Proclamation No. 21. Alternatively, if the Government did provide notice, that notice was vague and inadequate. Further, the plaintiff contends that, with respect to persons of Japanese ancestry, the Government's policies in 1945 and later indirectly restrained the plaintiff from returning to California. She also contends that her family remained under the domination of the WRA after January 20, 1945. In response, the defendant argues that the notice was adequate and that the Government did not place any restraints on the plaintiff's ability to return to the West Coast.

#### A. Action by the Government

The plaintiff contends that the WRA had authority over her family after January 20, 1945. The record indicates otherwise. The Tsumuras were relocated from Sacramento, California, and interned at Tule Lake, California. On May 28, 1943, Mr. Tsumura was granted indefinite leave for employment, and he relocated to Boise, Idaho. On June 28, 1943, Mrs. Tsumura and the plaintiff's sisters were permitted to follow Mr. Tsumura to Boise. When the Tsumuras were granted indefinite leave, they were no longer under the custody of the WRA. *See* AR at 34–35. The plaintiff was born after the custody period.

The plaintiff points to two instances, however, that she contends show that the Government retained custody over her family. First, Mrs. Tsumura, the plaintiff's mother, went to a store in Boise to purchase a kitchen knife sometime between 1943 and 1945. When the store owner refused to sell one to her, the WRA explained to the store owner that Mrs. Tsumura was not subject to any law preventing her from purchasing the knife, and Mrs. Tsumura proceeded to purchase the knife. The WRA, in this instance, merely relayed information to the store owner; the agency did not in anyway coerce Mrs. Tsumura or restrain her liberty.

The plaintiff also refers to an incident in which the family returned to Tule Lake in or around July 1945 in order to transfer Mr. Tsumura's parents to Boise, Idaho. Mr. Tsumura considered the family to be internees during that visit. However, there is no evidence that Mrs. Tsumura or any of her children, including the plaintiff, ever went to Tule Lake after 1943. Nor does the plaintiff offer any evidence that Mr. Tsumura was under Government supervision when he returned to Tule Lake. The evidence instead indicates that Mr. Tsumura traveled alone to Tule Lake, for the sole purpose of retrieving his parents and returning with them to Boise.

The Court concludes that there is no evidence that the WRA exercised direct control over the Tsumuras after they were granted indefinite leave, nor any evidence to suggest that the Government tried to interfere with the Tsumuras returning to California. The plaintiff's argument that her family could not return to California on or after January 20, 1945, must fail.

The plaintiff also argues that Proclamation No. 21 replaced a blanket exclusion with individual exclusion orders. Rather than provide relief to internees, the plaintiff contends that the new individual orders required internees to contact the WDC to determine whether or not individual orders applied to them.

The fact that these orders existed, however, says nothing about whether or not the Government prevented the *plaintiff's* family from returning to California. The individual exclusion orders applied to persons who refused to register on the Selective Service questionnaire, refused to serve in the United States armed forces, refused, without qualification, to swear allegiance to the United States, submitted a written statement of loyalty to Japan, were agents or operatives of Japan, or had requested revocation of American citizenship. *See* AR at 42. There is no evidence to suggest that the plaintiff or her family members were subject to exclusion orders or that they committed acts that could conceivably have rendered them subject to an individual exclusion order. Consequently, the Court finds that the Government's individual exclusion policy after Proclamation No. 21 did not prevent the plaintiff's family from returning to the West Coast, and the ORA's decision in this regard is neither arbitrary, capricious, an abuse of discretion, nor otherwise not in accordance with the law.

Finally, the plaintiff indicates that the Government pursued a policy of gradual, rather than immediate, resettlement after Proclamation No. 21, and that this policy constituted a compensable deprivation of liberty to the plaintiff. Secretary Ickes issued a press statement on December 18, 1944, which stated that the WRA's long-range objective "will be to bring about a better economic adjustment and a more satisfactory nation-wide distribution of a minority group which was doubtless too heavily concentrated before the war in one particular section of the country." AR at 69. The policy of the United States was to encourage persons of Japanese ancestry to relocate outside of the formerly prohibited area. However, the policy would also, Secretary Ickes noted, "aid those who prefer to exercise their legal and moral right to return to the West Coast." AR at 68. It is not clear from the record whether the Government would subsidize moves or use some other method to implement its goal of dispersion, but the policy did not prevent those who wanted to from returning to their original residential areas.[5]

---

5. In *Song,* the Court apparently relied on the Government's relocation strategy to support the

argument that people of Japanese ancestry continued to suffer deprivations of liberty. *See* at

The plaintiff may certainly question the rationale of such a policy, but in general, its mere existence had no apparent detrimental effect to persons of Japanese ancestry. As for the plaintiff's family, this policy could not have deprived the plaintiff of any liberty or property. There is no evidence in the record that her family was asked to relocate to a noncoastal area or that they were penalized for failing to do so. The record does indicate that the family returned to Sacramento by January 1946. The Court must therefore conclude that the Government's resettlement policy had no effect over the plaintiff or her family.

### B. Adequate Notice

The plaintiff also claims that the Government did not provide adequate notice to her family that Proclamation No. 21 had lifted the restrictions on her family's ability to return to the West Coast. The defendant, however, maintains that the Government provided adequate notice to persons of Japanese ancestry. The defendant points out that the Government provided two types of notice concerning the end of the exclusions. Public Proclamation No. 21 was published in the Federal Register on January 2, 1945, and several newspapers, including local newspapers for the Tsumuras, also published news of the Proclamation.

■■■ A person giving notice to a noticee must perform the process in a way that a person performing the process might reasonably adopt in order to inform the noticee. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Failing to do so implicate due process concerns. *See id.* at 313, 70 S.Ct. 652. By itself, however, publication in the Federal Register is sufficient to give notice of the contents of the document to a person subject to or affected by those contents. The Supreme Court has held that "[j]ust as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947). The United States Court of Claims, this Court's predecessor, stated that "[i]t is well settled that when regulations are published in the *Federal Register* they give legal notice of their contents to all who may be affected thereby." *See Wolfson v. United States,* 204 Ct.Cl. 83, 94, 492 F.2d 1386, 1392 (1974) (citing *Federal Crop,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10); *see also Lynsky v. United States,* 130 Ct.Cl. 149, 153, 126 F.Supp. 453, 456 (1954); *Coat Corp. of America v. United States,* 123 Ct.Cl. 176, 196, 105 F.Supp. 832, 834 (1952).

These cases involve prior, voluntary dealings with the Government, and arguably a different rule might be applied in difficult cases where the Government was ending a program that it later admitted deprived some individuals, without their choice, of their liberty rights. However, the *Federal Crop* rule did not come about solely because of a contractual relationship. In *Federal Crop,* the Federal Crop Insurance Corporation, an agency of the Department of Agriculture, was empowered to provide crop insurance against loss in yields due to unavoidable causes, including drought. 332 U.S. at 381, 68 S.Ct. 1. Farmers who applied and received crop protection apparently did not realize that the Wheat Crop Insurance Regulations excepted from their coverage spring wheat reseeded on winter wheat acreage. The existence of these regulations created terms and conditions for creating liability on the part of the Government and precluded recovery for the loss of the reseeded wheat. *See id.* at 384, 68 S.Ct. 1.

■■■ The Supreme Court found against the farmers that had suffered losses even though the Court took for granted that the farmers reasonably believed that their entire crop was covered by Government insurance and even though the Court "assume[d] that recovery could be had against a

---

643. Without evidence that this strategy actually prevented anyone of Japanese ancestry from returning to their homes, or represented other legal action taken by the Government, this Court cannot agree that the relocation strategy contributed in any possible way to a deprivation of liberty.

private insurance company." *Id.* at 383, 68 S.Ct. 1. Even a reasonable belief by a private party about the state of the law will not estop the Government from showing constructive notice by use of the Federal Register. Furthermore, the Federal Register Act of 1935, 49 Stat. 500, 502, 44 U.S.C. § 1507, did not mandate a prior contractual relationship with the Government in order to create constructive notice. Absent a case where the publication would be insufficient at law, publication in the Federal Register will provide constructive notice.

█ Regardless, however, the Tsumuras in this case received sufficient and accessible notice. The DOJ, in responding to comments concerning 28 C.F.R. § 74.3(b)(9), noted that widespread public notice of the lifting of the exclusion restrictions was disseminated in December 1944 and January 1945. Between December 17 and December 19, 1944, major newspapers in areas of heavy concentration of persons of Japanese ancestry reported the lifting of the exclusion zones. Information about the proclamation was also disseminated through publication in Japanese–American newspapers, which had wide circulation in the relocation centers and other population centers, especially in the western parts of the United States. *See* 62 Fed.Reg. at 19,931. The Pacific Citizen, for example, printed the information as its lead story in its December 23, 1944 issue: "The War Department on December 17 revoked the military orders excluding persons of Japanese ancestry from the Pacific coast military area. The sweeping revocation of the exclusion orders against citizens and law abiding aliens of Japanese ancestry was carried out through the issuance of Public Proclamation No. 21 \*\*\*." *Id.* Publication even occurred in Boise, Idaho, on the front page of The Idaho Daily Statesman. *See* Def.'s Reply in Supp. of It's [sic] Opp'n to Pl.'s Reply in Supp. of S.J. on the AR and Def.'s Cross–Mot. for J. Upon the AR, App. A.

The record in this case demonstrates the adequacy of public notice by showing the large numbers of persons of Japanese ancestry returning to the West Coast in 1945. Approximately 47,000 persons returned to the formerly prohibited zones in California, Washington, and Oregon in 1945. This figure does not even include persons who returned to the formerly prohibited zone in southern Arizona. *See* 62 Fed.Reg. at 19,931. Whether these people learned of the end of the exclusion from the Federal Register, newspapers large and small, or by word of mouth, it is clear that the vast majority of the persons of Japanese ancestry knew and acted in very short order on the Government's action.

In the promulgation of its regulations, the DOJ was well aware of the concerns that some families might slip through the cracks because they would not have heard about the lifting of the exclusions in a timely manner. *See id.* at 19,930. It carefully considered the question of notice by examining the historical record before creating 28 C.F.R. § 74.3(b)(9), and determined that adequate notice was relayed. However, given the notice available to the Tsumuras, and Mr. Tsumura's ability to read and to understand English, the Court agrees with the Government that its wide dissemination of the lifting of the exclusions was sufficient to result in adequate notice here.

Although this Court disagrees with the *Song*'s legal analysis, the facts of *Song* do suggest that the plaintiff in that case may have suffered a legal harm. Ms. Song lived in camp-like conditions in housing built, owned, and managed by the United States in rural New Jersey on the East Coast. *See Song*, at 642. Her family lived in an area during WWII where prisoners of war and enemy aliens were interned. *See id.* The Government in *Song* did not rebut that the plaintiff's family believed they were not free to return to their home. *See id.* Unlike the Tsumuras, the family in *Song* had an obligation to report all personal movements to the Federal Government. *See id.* at 643. It is also worth noting that newspaper publication of Proclamation No. 21 apparently did not reach rural New Jersey, where the family in *Song* was on work leave. *See id.* at 643. Thus, there are stark factual contrasts between the two cases. Whereas the Tsumuras were living in a large city in the West where there was additional notice through Japanese and major city newspapers and, consequent-

252

ly, had little reason to consider themselves still within the jurisdiction of the WRA, in *Song* there is some evidence that more adequate notice would have been appropriate to offset the family's belief that they were not free to return home.

In summary, the Government lifted the exclusions preventing persons of Japanese ancestry from returning to their original homes. It did so after the WRA ceased to have any authority over the Tsumuras and before the birth of the plaintiff. Consequently, upon her birth, the plaintiff was under no legal restraint that prevented her (and her parents) from returning to her parents' home in Sacramento. Because the regulations operate on a premise that the person of Japanese ancestry must have suffered legal harm, the plaintiff must be found ineligible for redress. That the Government may have failed to inform individually the Tsumuras of their freedom choices does not change this outcome, because the Government provided extensive notice, through newspapers and the Federal Register, to persons of Japanese ancestry that they were free to return to the West Coast. Having reviewed the facts of this case, the pertinent regulations and statutes, as well as the holding in *Ishida*, this Court must conclude that the Department of Justice drafted a permissible interpretation of the statutory law and correctly denied the plaintiff's claim. The decision of the ORA to deny Ms. Higashi redress pursuant to the Act was neither arbitrary, capricious, an abuse of discretion, nor otherwise not in accordance with the law. This Court must, therefore, grant the defendant's cross-motion for summary judgment and deny the plaintiff's motion.

## CONCLUSION

For the foregoing reasons, the defendant's cross-motion for summary judgment is granted, and the plaintiff's motion for summary judgment is denied. The plaintiff's Complaint is to be dismissed with prejudice.

Each party is to bear its own costs.